109 P.3d 849 (2005)
STATE of Washington, Respondent,
v.
Bob Dale BEASLEY, Appellant.
No. 31251-4-II.
Court of Appeals of Washington, Division 2.
March 8, 2005.
Publication Ordered April 5, 2005.
*852 Jeremy Richard Randolph, Attorney at Law, J. Andrew Toynbee, Attorney at Law, Chehalis, WA, for Respondent.
Peter B. Tiller, The Tiller Law Firm, Centralia, WA, for Appellant.
BRIDGEWATER, J.
¶ 1 Bob Dale Beasley appeals his convictions for assault, harassment, unlawful possession of a firearm, and unlawful imprisonment. We affirm.

FACTS
¶ 2 On October 2, 2002, Traci Harrison, Sherry Stein, and Stein's two grandsons went to look at property in Vader, Washington. The property belonged to Harrison's friend and Harrison was considering purchasing it. As the group arrived, they parked the car and got out to walk. Cameron Beasley, Bob Beasley's grandson, called to Harrison, asking her what she was doing on the property. Harrison told Cameron that she knew his aunt, Lynn Lawmaster. Cameron then explained to Harrison that there had been some cougar attacks in the area and he called his dogs to accompany the group.
¶ 3 As the group returned from walking the property, Harrison noticed a man at her car. As Harrison arrived and walked up to Beasley, an altercation occurred. Eventually Harrison and the others left the property and drove to a nearby restaurant, where Stein called law enforcement.
*853 ¶ 4 On October 3, the State charged Beasley with two counts of second degree assault with a firearm, two counts of harassment with a firearm, second degree unlawful possession of a firearm, and unlawful imprisonment with a firearm.
¶ 5 At the trial, Harrison testified that Lynn Lawmaster told her about the property in Vader. The property belonged to Lawmaster's mother. Harrison asked Stein if she and her grandchildren would like to accompany her to look at the property.
¶ 6 Harrison stated that when they arrived at the property, it appeared that somebody was occupying the land. They drove past the property, turned around, and came back. The children wanted to get out of the car so Harrison pulled over by a cattle gate. The group got out of the car, went around the cattle gate, and headed down toward a creek. Harrison testified that they did not stay long at the creek.
¶ 7 Once they entered the property, Cameron called out to them. Harrison approached Cameron and told him that she heard that the property was for sale. He told her the property was not for sale and that "there was a family dispute going on." 1 Report of Proceedings (RP) (Nov. 17, 2003) at 13. Harrison stated, "We are just getting out to let the kids ... stretch their legs." 1 RP at 13. She asked Cameron if he knew Lynn Lawmaster. Cameron answered yes. Harrison stated that Cameron then gave them permission to go onto the property.
¶ 8 The group went down to the creek. As they returned, Harrison and Stein's grandson, Garrett, walked in front of the group. As Harrison approached the road, she heard her car door slam. Harrison and Garrett ran up to the road.
¶ 9 Harrison testified that as she ran to her car, she noticed there was a car parked behind hers with a woman sitting in the driver's seat. A man was standing by the passenger side of her car holding a gun. The man was later identified as Bob Beasley. Harrison was familiar with guns because she used to hunt with her brothers.
¶ 10 Harrison asked Beasley, "What can I do for you?" 1 RP at 18. Beasley responded by pushing the nose of the rifle into her stomach. She then backed away from him. Harrison told Beasley that she was Lynn Lawmaster's friend. Beasley responded that he had disowned Lynn. Beasley then hit Harrison with the stock part of the gun on her right shoulder.
¶ 11 Harrison further testified that Beasley threatened to put a bullet into her head; he also threatened to shoot Stein. Beasley pointed the gun at Harrison's head and cocked it. Once Harrison got into the car, she could not leave because there was a car parked behind her.
¶ 12 Stein testified that as she approached the car, she noticed Beasley standing at the back end of Harrison's car with a gun pointing at Harrison. Once Beasley noticed Stein, he started "screaming." 1 RP at 66. Stein got into the car with her grandchildren. She then proceeded to lock all the car doors. Beasley continued to threaten killing the two women as Stein tried to get Harrison into the car.
¶ 13 Stein was familiar with guns because her family hunted and she testified that she was positive Beasley had a gun. Once Harrison got into the car, Stein attempted to call 911 on two different cell phones. She was able to complete the call but the phones continued to cut off. Stein stated that the group was in the car for over half an hour. During that time, Beasley continued to run around the car, screaming and yelling, while pointing the gun. He cocked and uncocked the gun and called the women names, telling them he was going to kill them.
¶ 14 Beasley finally got into the car parked behind Harrison's car. Stein testified that she felt threatened by Beasley and did not believe they would leave the property alive.
¶ 15 The State called Josh Sparks, Stein's other grandson. He testified that he heard his brother scream and that he and Stein went to the car. When they arrived at the car, Sparks noticed Harrison lying on the ground with a rifle pointed at her. Sparks identified Beasley as the man pointing the gun at Harrison. Sparks further testified that Harrison could not drive her car away *854 because there was a car blocking the space behind her.
¶ 16 Sparks was sure Beasley had a gun. His certainty was due to the fact his family hunted and he had previously seen a gun. Sparks also testified that he saw Beasley point the gun at Harrison's head and tell them he was going to kill the group because they had trespassed on his property.
¶ 17 Cameron Beasley testified that Harrison told him she had permission from Lynn Lawmaster to look at the property. Cameron notified Beasley and Carolyn Hope that there were people on the property. He stated that Beasley got dressed and went out to the vehicle with Hope. Beasley took an ax handle with him as he left.
¶ 18 The State showed Cameron his statement. In his statement, Cameron told Deputy Richard Van Wyck of the Lewis County Sheriff's Department that Beasley had a rifle. At trial, Cameron changed his statement. He stated that the end of the ax handle looked like the end of a gun.
¶ 19 Carolyn Hope is Bob Beasley's significant other. She is a nurse and was Beasley's caregiver at the time of the altercation. Hope testified that Cameron came in around 7:45 P.M. and told her and Beasley that there were people on the property. Hope said she heard voices and since it was dark she spotlighted the back field. She could not see any people, but she did hear their voices.
¶ 20 Hope and Beasley got into Hope's car and drove down to the property. Hope parked behind Harrison's car.
¶ 21 Beasley got out of Hope's car. Hope testified that after the two women and two boys arrived at Harrison's vehicle, four or five minutes passed and then Hope and Beasley returned to their house.
¶ 22 On cross-examination, Hope testified regarding Beasley's health in October 2002. He suffered from osteoarthritis and gout arthritis and he had spinal stenosis in the lower back. He also had a problem with his prosthesis not fitting well. Hope stated that she had never seen Beasley run since the time he received his prosthesis.
¶ 23 Jeff Godbey of the Lewis County Sheriff's Department also testified. He contacted Harrison and Stein at Brook's Nook Tavern in Vader. When he arrived at the tavern, he found Harrison, Stein, and the two boys, all of whom appeared upset. Deputy Godbey first interviewed Harrison. At trial, the prosecutor asked the deputy, "And I'm not asking you to tell us what they said, but in your professional opinion, did the two versions of events, Ms. Harrison's version of events and Ms. Stein's version of events, were they in dispute?" 2 RP (Nov. 18, 2003) at 218. Deputy Godbey responded that the statements taken independently appeared to be accurate. Beasley did not object to this question. The prosecutor followed up his question with, "My focus on that question was having interviewed them separately, did their stories match up?" 2 RP 218-19. The deputy stated the stories were consistent and accurate. Beasley also did not object to this response.
¶ 24 Deputy Godbey testified that Harrison complained of injuries. At that time, the State read from Beasley's stipulation that Harrison contacted Kaiser Medical for injuries sustained as a result of contact with him.
¶ 25 Deputy Godbey and Deputy Van Wyck went to Beasley's house. Beasley gave his version of events from that night. The deputy testified that he asked Beasley if he had a firearm when he contacted the two females. Beasley responded that he did not have any firearms in his residence. He told the deputy that he had an ax handle that he used to defend himself from the two women. Deputy Godbey also spoke with Hope.
¶ 26 During cross-examination, Deputy Godbey stated that he did not do a formal search for the rifle. He looked in the plain view areas but did not find a rifle. Deputy Godbey admitted that "it would have been nice to have a firearm." 2 RP at 235. After questioning Beasley, Deputy Godbey transported him to the Lewis County jail.
¶ 27 The State next called Deputy Van Wyck. He testified to seeing scratch marks on Beasley's chest and face when he arrived at Beasley's residence after the altercation. Deputy Van Wyck asked Cameron if Beasley kept weapons in the house. Cameron told *855 him yes. The deputy took a taped statement from Cameron. Cameron stated that his grandfather kept rifles in the house.
¶ 28 During cross-examination, defense counsel asked Deputy Van Wyck if he thought Cameron was a "truthful kid." 2 RP at 265. The State objected to the question. The court admonished defense counsel and told him he could not ask police officers for their opinions of the truthfulness of witnesses. Deputy Van Wyck further testified that at no time when he took Cameron's statement did Cameron mention an ax handle.
¶ 29 Beasley also testified. He stated that he intended to purchase his sister's property that was located across from his. His sister had a fire on her property four or five months before the altercation. After the fire, his sister asked him to watch her property.
¶ 30 On the night of the altercation, Beasley was in bed when he heard Cameron tell Hope that there were people on the property. Beasley got out of bed and asked Hope to drive him over to the property. Beasley testified that the property had do not trespass signs and yellow police ribbons on it.
¶ 31 Beasley stated that he did not pick up a rifle and that he had no rifles in his home. He testified that he grabbed an ax handle off of the porch and brought it with him in the car. He and Hope drove past Harrison's car, went down a few more driveways, turned around, and then came back to his sister's driveway. Beasley testified that there was enough room for Harrison's car to back out of the driveway.
¶ 32 Beasley got out of the car and looked in Harrison's car to see if anybody was in it. At that time he heard a lady screaming in the field. The woman was screaming at him. Beasley asked the women what they were doing in the field and to see their identification. Beasley stated that the incident from the time he reached Harrison's car until he left lasted no longer than five minutes. He also testified that one of the women clawed him in the face but he could not remember how he received the scratches on his chest. Deputy Godbey took pictures of his face.
¶ 33 Beasley told the deputies that he did not have a rifle in the house or on his property. He gave them permission to look in his house. Beasley adamantly denied assaulting Harrison. He also stated that he could not have run around the car because he was physically unable to perform such activity.
¶ 34 After Beasley's testimony, the court took a recess. When court reconvened, Beasley was not in the courtroom. Defense counsel asked the court to give Beasley a few more minutes to return to the courtroom. The State responded that it had received information from Beasley's family members that he and Hope had fled and had no intentions of returning to court. The State asked that the case proceed. The court then asked defense counsel if he had any more information regarding Beasley. The State asked to call Cameron for examination by the court.
¶ 35 Cameron stated that he had had contact with Beasley at the end of court that morning. Beasley told Cameron to tell the attorneys that he might not be back for court that afternoon. The court asked whether Beasley gave Cameron a reason for not returning and Cameron responded, "[n]o." 3 RP (Nov. 19, 2003) at 355.
¶ 36 After Cameron's examination, the court administrator told the court that Hope returned to court without Beasley and that Hope stated she dropped Beasley off a block away from the courthouse. Hope returned to the courthouse believing that Beasley had already returned. Hope stated that Beasley was distraught and told her that he needed some time to himself. He had Hope drive him down to the Star Tavern. Beasley told her he would walk back to the courthouse. The court found that Beasley's absence was voluntary. The State moved for a warrant and the court granted the motion.
¶ 37 The court then instructed the jury. The jury returned a verdict of guilty on all six counts. Although there was no unanimity instruction, the court polled the jury after reading the verdict.
¶ 38 Before sentencing Beasley, the court asked Beasley about his absence from the trial. Beasley stated that he did not think the trial had gone well. He had a bad mental *856 breakdown and he told Hope to drop him off somewhere. Beasley went home with an unidentified man and spent a week at the man's house. After hearing from Beasley and the State, the court affirmed its earlier finding of voluntary absence and that Beasley waived his right to be present at trial.
¶ 39 After the State gave its sentencing recommendation, the court asked the State whether it considered applying the same course of conduct rule. The State responded the rule did not apply because the crimes involved different victims. The court then asked Beasley if he wanted to comment. Counsel for Beasley replied that he left the determination of same course of conduct to the trial court. The court sentenced Beasley to 120 months incarceration, a standard range sentence.

I. Unanimity Instruction
¶ 40 Beasley argues that the court committed a constitutional error when it failed to instruct the jury that it had to be unanimous on which acts constituted second degree assault, harassment, and unlawful imprisonment. The State responds that no unanimity instruction was necessary because the trial court polled the jury.
¶ 41 We have detailed the events as they unfolded that day. Because they are "continual," no unanimity instruction was required. Typically a unanimity instruction is given when the facts show two or more criminal acts that could constitute the crime charged. State v. Petrich, 101 Wash.2d 566, 569, 683 P.2d 173 (1984), modified by State v. Kitchen, 110 Wash.2d 403, 411, 756 P.2d 105 (1988). In that situation, the jury must unanimously agree on the same act to convict the defendant. Petrich, 101 Wash.2d at 569, 683 P.2d 173. But Petrich also addresses the circumstance of a continuing event:
Under appropriate facts, a continuing course of conduct may form the basis of one charge in an information. But "one continuing offense" must be distinguished from "several distinct acts," each of which could be the basis for a criminal charge. See United States v. Berardi, 675 F.2d 894 (7th Cir.1982); People v. Mota, [115 Cal.App.3d 227, 171 Cal.Rptr. 212 (1981)]. To determine whether one continuing offense may be charged, the facts must be evaluated in a common sense manner.
Petrich, 101 Wash.2d at 571, 683 P.2d 173. The Supreme Court reiterated this standard in State v. Crane, 116 Wash.2d 315, 804 P.2d 10, cert. denied, 501 U.S. 1237, 111 S.Ct. 2867, 115 L.Ed.2d 1033 (1991). We hold that a unanimity instruction was unnecessary in this case because the events were continual. Nonetheless, we also address Beasley's claim that this was a multiple acts case.
¶ 42 The law in Washington is that a defendant may be convicted only when a unanimous jury concludes that the defendant committed the criminal act charged in the information. Petrich, 101 Wash.2d at 569, 683 P.2d 173. When the State presents evidence of several acts that could form the basis of one charged count, the State must either tell the jury which act to rely on in its deliberations or the court must instruct the jury to agree on a specific criminal act. Petrich, 101 Wash.2d at 570, 683 P.2d 173. The failure to follow one of the above options violates the defendant's State constitutional right to a unanimous jury verdict and his United States constitutional right to a jury trial. State v. Badda, 63 Wash.2d 176, 182, 385 P.2d 859 (1963); U.S. Const. amend. 6; Wash. Const. art. 1, § 22.
¶ 43 A multiple acts case is one where the State alleges several acts, any one of which could constitute the crime charged. Kitchen, 110 Wash.2d at 411, 756 P.2d 105. A multiple acts case requires that the jury be unanimous on which act or incident constituted the crime. Kitchen, 110 Wash.2d at 411, 756 P.2d 105. In order to ensure jury unanimity, the State must either elect the particular criminal act on which it will rely for conviction, or the trial court must instruct the jury that all members must agree that the State proved the same underlying criminal act beyond a reasonable doubt. Petrich, 101 Wash.2d at 572, 683 P.2d 173. A constitutional error occurs if the State fails to properly elect the criminal act and the trial court fails to instruct the jury on unanimity. Kitchen, 110 Wash.2d at 411, 756 P.2d 105. An error occurs because of the "possibility that some *857 jurors may have relied on one act or incident and some another, resulting in a lack of unanimity on all of the elements necessary for a valid conviction." Kitchen, 110 Wash.2d at 411, 756 P.2d 105.
¶ 44 When a court reviews a multiple acts case where there was no election by the State or unanimity instruction by the trial court, it must determine if the error was harmless. Kitchen, 110 Wash.2d at 411, 756 P.2d 105. An error is not harmless" `if a rational trier of fact could have a reasonable doubt as to whether each incident established the crime beyond a reasonable doubt.'" Kitchen, 110 Wash.2d at 411, 756 P.2d 105 (quoting State v. Loehner, 42 Wash.App. 408, 411, 711 P.2d 377 (1985), (Scholfield, J., concurring), review denied, 105 Wash.2d 1011 (1986)).
¶ 45 On counts I and II, testimony presented at trial by Traci Harrison and Sherry Stein was that Beasley pointed a gun at each of them, he knocked down Harrison with the gun, and threatened each of them during the incident. Harrison further stated that Beasley jabbed the rifle into her stomach and slammed the rifle down on her shoulder, knocking her to the ground. Stein testified that Beasley raised the rifle to the window near her head. Beasley told both women he could kill them both with one shot.
¶ 46 Beasley contends that the record does not show which of the acts the jury relied on to find him guilty of second degree assault. If this is properly characterized as a multiple acts case, there was no election by the State and the jury did not receive a unanimity instruction, thus, if an error occurred, we review it to determine whether it was harmless.
¶ 47 Here, the error, if any, was harmless. Harrison, Stein, and Stein's grandson all had similar testimony regarding Beasley pointing the gun and making threats. There was also evidence that Harrison received medical treatment for the injuries she sustained during the assault. If the jury believed that Beasley pointed the gun at both women and made threats to kill them, no rational trier of fact could have entertained a reasonable doubt regarding the other events that occurred during the incident. Even if we held that this was a multiple acts case, we would find the error harmless and affirm Beasley's convictions for counts I and II.
¶ 48 Our above analysis is equally applicable to the counts involving harassment, counts III and IV. No rational trier of fact could have entertained a reasonable doubt regarding the acts because each incident established the crime beyond a reasonable doubt. At oral argument, Beasley was invited to point to any of the incidents that could have been relied on by the jury that would have permitted a reasonable doubt as to the assaults or the harassment counts, none was noted. We have examined the evidence and find none.
¶ 49 Finally, Beasley contends that there were multiple acts in the unlawful imprisonment count. We note that in that count he is alleged to have imprisoned only Harrison. Beasley alleges that the multiple acts involved in this count could have been either his "... threats, or due to the vehicle driven by Hope was allegedly parked behind Harrison's car." Br. of Appellant at 29. But, the information did not allege this second act, there was no testimony that Beasley operated the car driven by Hope or directed her movements, and there was no argument that this act could have been a basis for the offense. Thus, the multiple act theory simply does not apply to this count.
¶ 50 Under either analysis, i.e., continual conduct or multiple acts, Beasley's argument fails. The State argues that because the court polled the jury, no unanimity instruction was necessary. We address this claim to clarify this method of curing a multiple acts case.
¶ 51 Although it is true that the court polled the jury, the questions the court asked do not provide insight into which act the jury found to establish the crimes charged. The court specifically asked each juror two questions: (1) were these your verdicts; and (2) were these the verdicts of the jury. Neither of these questions specifically asks whether the jury found a specific act, or that all acts proven, constituted the crime charged. Although Badda, 63 Wash.2d at 182, 385 P.2d *858 859, suggests jury polling could show jury unanimity, the court held that the jury polling in that case did not. In Badda, there was simply a brief reference that the court polled the jury and that the 12 jurors answered that the verdict was their individual verdict and the verdict of the jury. That reference is similar to the one here. There is simply not enough information in the record to find that the jury polling adequately proved jury unanimity. This would be a cumbersome and difficult method of assuring unanimity in a multiple count case as Badda points out. In a multiple acts case, it is wiser to simply give the unanimity instruction.

II. Same Criminal Conduct
¶ 52 Beasley asserts the State erred when it calculated his offender score because his acts involved the same criminal conduct. The State responds that Beasley waived this argument when he failed to object to his offender score at trial. We agree.
¶ 53 RCW 9.94A.589(1)(a) states in relevant part:
[W]henever a person is to be sentenced for two or more current offenses, the sentence range for each current offense shall be determined by using all other current and prior convictions as if they were prior convictions for the purpose of the offender score: PROVIDED, That if the court enters a finding that some or all of the current offenses encompass the same criminal conduct then those current offenses shall be counted as one crime.
¶ 54 The State argues that under In re Goodwin, 146 Wash.2d 861, 50 P.3d 618 (2002), Beasley waived his right to appeal his miscalculated offender score because he failed to object at trial. In Goodwin, the Supreme Court held that a waiver may occur in matters that involve a trial court's discretion. Goodwin, 146 Wash.2d at 874, 50 P.3d 618. In reaching its conclusion, the court relied on State v. Nitsch, 100 Wash.App. 512, 997 P.2d 1000, review denied, 141 Wash.2d 1030, 11 P.3d 827 (2000). In Nitsch, Division One held that the application of the same criminal conduct statute is one that involves both factual determinations and the exercise of discretion. Nitsch, 100 Wash.App. at 523, 997 P.2d 1000.
¶ 55 In the present case, the court asked the State whether it had considered the issue of same course of conduct. The State responded that the crimes did not constitute the same course of conduct. The court then asked Beasley the same question. Counsel for Beasley responded that the issue was one for the court's determination. Beasley left the determination to the court and thus, waived his right to object to this issue.

III. Ineffective Assistance of Counsel
¶ 56 Beasley contends that he received ineffective assistance of counsel during trial and at sentencing. In order to prevail on a claim of ineffective assistance of counsel, Beasley must prove: that his counsel's performance was deficient and that this deficient performance resulted in prejudice. State v. Hendrickson, 129 Wash.2d 61, 77-78, 917 P.2d 563 (1996) (citing Strickland v. Washington, 466 U.S. 668, 686-87, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Beasley can establish deficient performance by showing that his counsel's conduct fell below an objective standard of reasonableness and was not based on a legitimate, strategic, or tactical decision. Hendrickson, 129 Wash.2d at 77-78, 917 P.2d 563. Beasley establishes prejudice only if he can show that the trial outcome would have differed but for counsel's deficient performance. State v. Thomas, 109 Wash.2d 222, 226, 743 P.2d 816 (1987).
¶ 57 Beasley first asserts his counsel was ineffective because counsel failed to argue that Beasley's charges were part of the same criminal conduct. Beasley further states that there was no tactical or strategic reason for trial counsel not to challenge his offender score. But in order to prevail on this claim, Beasley must show both deficient performance by counsel and that the deficient performance resulted in prejudice. Beasley fails to prove both prongs. Specifically, he cannot show that had trial counsel argued for a finding of same criminal conduct, the sentence would have differed. The firearm enhancements alone totaled 126 months, he was facing 126 months and the standard ranges on count I or count II. He received a sentence *859 of 120 months  the statutory maximum for assault in the second degree. He cannot demonstrate that his trial counsel's alleged deficient performance at sentencing was prejudicial.
¶ 58 Beasley contends that trial counsel was ineffective because counsel failed to object to improper questions asked by the prosecution. Because he also claims prosecutorial misconduct related to these questions we address them together.

IV. Prosecutorial Misconduct
¶ 59 Beasley asserts that the prosecutor committed misconduct when he improperly questioned Deputy Godbey about the credibility of Harrison's and Stein's statements. He also alleges that trial counsel was ineffective for failing to object to these questions. Beasley appears to take issue with Deputy Godbey's answers. Review of the record finds that the prosecutor did not commit prosecutorial misconduct. Also, we hold that because there was no misconduct, there was not ineffective assistance of counsel.
¶ 60 In order for Beasley to obtain reversal of his conviction on the basis of prosecutorial misconduct, he must show the prosecutor's conduct was improper and the conduct had a prejudicial effect. State v. Brett, 126 Wash.2d 136, 175, 892 P.2d 29 (1995), cert. denied, 516 U.S. 1121, 116 S.Ct. 931, 133 L.Ed.2d 858 (1996). Beasley must show the conduct of the prosecutor had a substantial likelihood of affecting the verdict. Brett, 126 Wash.2d at 175, 892 P.2d 29. Because Beasley failed to object to the prosecutor's questions, he cannot claim prosecutorial misconduct on appeal unless the misconduct was so flagrant and ill intentioned that a curative instruction could not have neutralized any prejudice. State v. Hoffman, 116 Wash.2d 51, 93, 804 P.2d 577 (1991). This court reviews a prosecutor's remarks in the "context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury." State v. Brown, 132 Wash.2d 529, 561, 940 P.2d 546 (1997), cert. denied, 523 U.S. 1007, 118 S.Ct. 1192, 140 L.Ed.2d 322 (1998).
¶ 61 The State's questions were in response to defense counsel's attempt to infer that Harrison and Stein had met and worked on their testimonies. During cross-examination of Stein, the following exchange took place:
Q: I see. Did you and Traci talk about this?
A: No.
Q: You never talked about your testimony here today?
A: I haven't been with Traci for a while.
Q: For how long?
A: Oh, the  since the summer.
Q: Since last summer?
A: Since this last summer.
1 RP at 84. This type of questioning continued throughout the cross-examination. Beasley asked Stein several times whether she had discussed the events of the incident with Harrison before coming to the trial. Each time Stein said no.
¶ 62 On direct examination of Deputy Godbey, the State asked the following questions:
Q: And I'm not asking you to tell us what they said, but in your professional opinion, did the two versions of events, Ms. Harrison's version of events and Ms. Stein's version of events, were they in dispute?
A: No, they both  both taken independently appeared to be very accurate, and using the word professional opinion I believed that both of them were being extremely sincere due to their emotional states at that time.
Q: My focus on that question was having interviewed them separately, did their stories match up?
A: Right, yeah, they were both accurate.
Q: Well, accurate versus consistent.
A: Both  they were consistent and accurate.
2 RP at 218-19. The State's questioning of Deputy Godbey was not an attempt to enter improper opinion testimony but rather an attempt to rebut the defense's inference that Harrison and Stein had lied about the incident by getting together and working on their stories before testifying. As well, Beasley invited this line of testimony by intimating *860 joint fabrication. Therefore, there was no prosecutorial misconduct. The prosecutorial questioning was not improper. The answers may have been somewhat nonresponsive, but Beasley does not establish that had there been an objection, the trial court would have sustained it. Even if the court had sustained the objection, Beasley would have been entitled to a curative instruction. There was no prejudice shown and Beasley does not carry his burden with regard to ineffective assistance or prosecutorial misconduct.

V. Insufficient Evidence
¶ 63 Beasley contends that the evidence is insufficient to establish that he assaulted Harrison and Stein with a rifle, that he harassed either witness by threatening to kill them, and that he possessed a deadly weapon. We address each contention below.
¶ 64 We find evidence sufficient to support a conviction if, when viewed in the light most favorable to the State, it permits any rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt. State v. Joy, 121 Wash.2d 333, 338, 851 P.2d 654 (1993). Where a defendant claims insufficient evidence, he admits the truth of the State's evidence and, thus, all reasonable inferences must be drawn in favor of the State and interpreted most strongly against the defendant. State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial evidence and direct evidence have equal weight. State v. Delmarter, 94 Wash.2d 634, 638, 618 P.2d 99 (1980). In reviewing the evidence, we give deference to the trier of fact, which resolves conflicting testimony, evaluates the credibility of witnesses, and generally weighs the persuasiveness of the evidence. State v. Walton, 64 Wash.App. 410, 415-16, 824 P.2d 533, review denied, 119 Wash.2d 1011, 833 P.2d 386 (1992).

1. Second Degree Assault
¶ 65 To prove that Beasley assaulted the victims, the State had to show that in circumstances not amounting to first degree assault, Beasley assaulted Harrison and Stein with a deadly weapon. RCW 9A.36.021(1)(c). Beasley argues that it was strongly contested that he had a firearm at the time of the offenses.
¶ 66 At trial, Harrison, Stein, and Sparks all testified that Beasley had a rifle. Harrison testified that Beasley hit her with the gun. All of the witnesses were familiar with what a rifle looked like because of experience with hunting. Moreover, even though he later recanted his statement on the stand, Cameron Beasley initially told police officers that his grandfather was armed with a rifle. Further, Beasley stipulated to the medical records showing that Harrison had received medical care due to injuries sustained during the assault.
¶ 67 Beasley points to the statement made by Deputy Van Wyck that he considered it a mistake that the police had never looked for the gun, especially since no gun was contained in the evidence. It is in the sole province of the jury to determine credibility and its determination is not reviewable. State v. Myers, 133 Wash.2d 26, 38, 941 P.2d 1102 (1997). Here, the jury heard all of the evidence and found the other witnesses more credible than Beasley. The record contains sufficient evidence to support Beasley's conviction.

2. Harassment
¶ 68 In order to prove the harassment counts, the State had to prove that:
[W]ithout lawful authority, [the person] knowingly threatens to cause bodily injury immediately or in the future to another person and when he by words or conduct places the person threatened in reasonable fear that the threat will be carried out.
Jury instruction 10. Clerk's Papers (CP) at 44.
¶ 69 A threat as discussed in this case means:
[T]o communicate, directly or indirectly, the intent to cause bodily injury in the future to the person threatened or to any other person or to do any other act which is intended to harm substantially the person threatened or another with respect to *861 that person's health, safety, business, financial condition or personal relationships.
Jury instruction 13. CP at 49.
¶ 70 Harrison testified that Beasley took his rifle and with the nose of the gun pushed it into her stomach. She also testified that Beasley hit her on the right shoulder with the stock of his gun and that he threatened to put a bullet into her head and that of her friend, Stein. Harrison stated that Beasley pointed the gun at her and Stein several times during the altercation. Stein also testified that Beasley had a gun. She stated that Beasley threatened to kill the two women. Stein further testified that Beasley was going back and forth between the two sides of Harrison's car beating and pounding on the hood and screaming at the women. Sparks testified that he saw Harrison lying on the ground and Beasley pointing a rifle at her.
¶ 71 Beasley's actions fell under the definitions of harassment and threat given to the jury. As the reviewer of the evidence, the jury found that the events as told by the victims did in fact happen. The evidence supports the jury's verdict.

3. Unlawful Imprisonment
¶ 72 Beasley asserts that the evidence does not support the conviction for unlawful imprisonment of Harrison. Beasley fails to explain why the evidence does not support the conviction but merely cites the two statutes the State had to prove in order to obtain a conviction.
¶ 73 A person is guilty of unlawful imprisonment if he knowingly restrains another person. Restrain means:
[t]o restrict another person's movements without consent and without legal authority in a manner which interferes substantially with that person's liberty. Restraint is without consent if it is accomplished by physical force, intimidation or deception or any means including acquiescence.
Jury instruction 21. CP at 58.
¶ 74 There was evidence that Harrison was held at gunpoint, both on the ground and in her car. There was also the evidence that Beasley told Harrison that he was going to kill her. There was evidence that Beasley circled the car with the rifle, that he was screaming and yelling while pointing the rifle at the car, and that he told Harrison that he intended to kill her. All of the witnesses spoke of their fear that Beasley would in fact kill them. Beasley denied the allegations of the witnesses. But as we previously discussed, determinations of credibility are for the jury to decide. Myers, 133 Wash.2d at 38, 941 P.2d 1102. Taking the evidence in the light most favorable to the State, it supports the conviction for unlawful imprisonment.

4. Weapon Enhancements
¶ 75 Beasley argues that the jury could not have found beyond a reasonable doubt that he possessed a rifle during his confrontation with Harrison and Stein.
¶ 76 RCW 9.94A.602 states in part:
In a criminal case wherein there has been a special allegation and evidence establishing that the accused or an accomplice was armed with a deadly weapon at the time of the commission of the crime, ... if a jury trial is had, the jury shall, if it find[s] the defendant guilty, also find a special verdict as to whether or not the defendant ... was armed with a deadly weapon at the time of the commission of the crime.
¶ 77 The testimony of Harrison, Stein, and Sparks was that Beasley had a rifle the day of the assault. Deputy Godbey testified that no gun was ever found but also that law enforcement did not search for a gun. In his statement to Deputy Van Wyck, Cameron Beasley told the deputy that his grandfather had a rifle. Although he recanted his statement, the other evidence taken in a light most favorable to the State would allow a jury to conclude Beasley was armed with a weapon when he committed the offenses. Thus, sufficient evidence existed to support the weapon enhancements.

VI. Absence from Trial
¶ 78 Beasley contends that the trial court erred when it continued with trial after *862 he failed to appear on November 19, 2003. We disagree.
¶ 79 CrR 3.4(b) provides that a defendant's voluntary absence from trial after it has begun shall not prevent the court from continuing the trial. A court determines whether a defendant has voluntarily waived his presence at trial by looking at the totality of the circumstances. State v. Thomson, 123 Wash.2d 877, 881, 872 P.2d 1097 (1994). The trial court uses a three-part analysis to determine whether a defendant's absence was voluntary. Thomson, 123 Wash.2d at 881, 872 P.2d 1097. First, the court looks into the circumstances of the defendant's disappearance in order to justify a finding that the absence is voluntary. Thomson, 123 Wash.2d at 881, 872 P.2d 1097. Second, the court makes a preliminary finding of voluntariness. Thomson, 123 Wash.2d at 881, 872 P.2d 1097. Finally, the court provides the defendant with an adequate opportunity to explain his absence once the defendant is returned to custody and before the imposition of a sentence. Thomson, 123 Wash.2d at 881, 872 P.2d 1097.
¶ 80 Here, before finding Beasley voluntarily absent from trial, the court looked into his whereabouts. Both Cameron and Hope stated they did not know if Beasley planned to return to court. And Hope testified that Beasley had voluntarily left the courthouse. The court then made a preliminary ruling that Beasley was voluntarily absent from trial. At sentencing, Beasley had the opportunity to explain his absence. The court then affirmed its earlier ruling. The court clearly complied with the steps set out in Thomson and did not abuse its discretion by continuing the trial in Beasley's absence.

VII. Statement of Additional Grounds for Review (SAG)
¶ 81 Beasley raises several issues in his SAG. The first is that he was physically unable to do any of the things charged to him. Beasley's caretaker testified to his medical condition at trial. But Beasley did not enter any evidence suggesting that because of his medical condition he was unable to do the crimes charged. The jury had this information to consider and still found Beasley guilty of the charged crimes. Accordingly, this argument fails.
¶ 82 Beasley also asserts there were no medical pictures introduced to support Harrison's statement about the assault. The State did not introduce any pictures to corroborate Harrison's story. But, after Harrison testified, the State secured her medical records from her health care provider. Those records stated that Harrison was seen for injuries received as the result of an assault. The State did not introduce the medical records. Instead, defense counsel agreed to stipulate that Harrison saw a medical provider in relation to the case.
¶ 83 In response to the assault charge, Beasley asserts that Harrison scratched his face. Law enforcement took photographs of Beasley's face after the altercation but the photographs were not introduced at trial. It is unclear why the parties did not seek admission of the photographs.
¶ 84 Beasley also states that many things were left out in court. Those things include statements regarding Beasley's character and an affidavit from Rich Michaels. Because the evidence to support Beasley's claims lies outside the evidence submitted to this court, we cannot review these issues. State v. Stevenson, 16 Wash.App. 341, 345, 555 P.2d 1004 (1976) (matters referred to in the brief but not included in the record cannot be considered on appeal), review denied, 88 Wash.2d 1008 (1977). A personal restraint petition is the proper method for raising issues that depend on matters outside of the record. RAP 16.4(c)(3).

VIII. Costs on Appeal
¶ 85 The State asks that Beasley be required to pay all the taxable costs of this appeal. We may require an adult convicted of an offense to pay appellate costs. RCW 10.73.160(1); State v. Nolan, 141 Wash.2d 620, 627, 8 P.3d 300 (2000) (citing State v. Blank, 131 Wash.2d 230, 234, 930 P.2d 1213 (1997)). Under RCW 10.73.160(1), appellate courts are allowed, under the Rules of Appellate Procedure (RAP), Title 14, to award the State appellate counsel expenses incurred on behalf of a defendant if the State is the *863 substantially prevailing party. Nolan, 141 Wash.2d at 628, 8 P.3d 300. The award is discretionary, consistent with the appellate court's authority under RAP 14.2 to decline to award costs. Nolan, 141 Wash.2d at 628, 8 P.3d 300.
¶ 86 We grant the State's request for appellate costs, subject to its compliance with RAP Title 14, because the State is the prevailing party.
¶ 87 Affirmed.
We concur: HOUGHTON, P.J., and ARMSTRONG, J.