# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  50410-3-II |
| Respondent, | |
| v. | |
| JEREMY EUGENE TATE, | UNPUBLISHED OPINION |
| Appellant. | |

SUTTON, J. — Jeremy Eugene Tate appeals his jury trial convictions for the fourth degree assault and unlawful imprisonment of Robin Tate.  Tate[1] argues that (1) the trial court erred by failing to give the jury a unanimity instruction related to the unlawful imprisonment charge and (2) he received ineffective assistance of counsel when defense counsel failed to object to a witness and the State referred to Robin as the "victim."  Tate also appeals the imposition of a $200 criminal filing fee.  Because the State elected which act constituted unlawful imprisonment and Tate fails to show that defense counsel's failures to object were prejudicial, we affirm the convictions.  But we remand for the trial court to determine whether Tate is indigent under RCW 10.101.010(3)(a), (b), or (c), and whether it can impose the criminal filing fee under RCW 36.18.020(2)(h).

---

[1] For clarity, we refer to Jeremy Tate by his last name and to Robin Tate by her first name.  We also refer to Tate's mother Dorothy Tate and Tate's son Jarod Tate, by their first names for clarity. We intend no disrespect.

FACTS

Tate and Robin had lived together in a fifth-wheel trailer on Tate's mother's property.[2] After an altercation between Robin and Tate on February 8, 2017, the State charged Tate with second degree assault, fourth degree assault, and unlawful imprisonment.[3] The case proceeded to a jury trial.

### I. MOTION IN LIMINE

In a motion in limine, Tate asked the trial court to exclude "[a]ny testimony, evidence or reference to Robin Tate as a 'victim.'" Clerk's Papers (CP) at 62. The State did not object to this motion in limine. The trial court granted this motion in limine.[4]

### II. TESTIMONY

#### A. STATE'S WITNESSES

Robin, the Tates' neighbors Amy Nielson and Scott Warnes, Skamania County Sheriff's Office Deputy William Helton, and Tate's son Jarod testified for the State.

#### 1. Robin's Testimony

Robin testified that on February 8, after she had moved out of the trailer she previously shared with Tate, she returned to Tate's parents' home to retrieve some items that she had left

---

[2] Robin and Tate share the same last name because Robin had previously been married to Tate's brother.

[3] Each charge was designated as a domestic violence offense. The domestic violence designation is not at issue in this appeal.

[4] We do not have a record of the trial court's ruling on this motion in limine. But the record shows that the State did not object to this motion in limine, and on appeal the parties do not dispute that the trial court granted this motion.

behind. While she was there, Tate arrived and wanted Robin to accompany him to a cabin, which they referred to as "the bungalow," near Tate's parents' home. 1 Verbatim Report of Proceedings (RP) at 72.

According to Robin, Tate "got mad" when she declined his invitation. 1 RP at 73. He then threw her tobacco container into the laundry room, took Robin's portable jukebox, ran out of the house, and told Robin that he was going to destroy the jukebox.

As Robin was cleaning up the tobacco that had spilled when Tate threw the container, Tate returned. He told her that he was going to punch her in the face and then punched her in the face. Tate's parents came into the laundry room, and Robin told Tate's mother Dorothy that she (Robin) "just wanted to go home." 1 RP at 74. Robin promised not to call the police if Dorothy would take her home.

Robin testified that as she and Dorothy started to leave, Tate jumped into the back seat of Dorothy's car. Rather than drive her home, Dorothy drove them to two stores.

While at the first store, Tate went inside and Robin spoke on Dorothy's phone to the friend who had dropped her (Robin) off at the Tates' residence. After they arrived at the second store, Tate and Dorothy prevented Robin from exiting the car by holding down the door lock and then pulling her (Robin) back into the car when she attempted to climb out a window. Tate then reached over from the back seat, put his arm around her neck, and attempted to choke her. Dorothy then drove them back to the Tate home.

Robin testified that she went back inside the house, Tate followed her into the kitchen, threw her to the floor, attempted to choke her, and punched her in the chest. When Jarod intervened, Robin broke free and ran to a neighbor's house.

3

The neighbors let Robin in, and she told them what had happened. Robin stated that once she was inside the house, they could see Dorothy's vehicle driving up and down the road. One of the neighbors drove Robin home, and someone from the Skamania County Sheriff's Office arrived about ten minutes later.

On cross examination, Robin admitted that she had not tried to leave the car when Dorothy stopped at the first store even though Tate was not in the car. Robin also admitted that when she was on the phone with her friend, she (Robin) did not ask her friend for a ride home.

In addition, Robin testified that the second time she tried to get out of the car, the car was moving. Robin asserted that she had asked Dorothy several times to let her out of the car.

2. The Neighbors' Testimony

Nielson testified about her family helping Robin on the night of the incident. When Robin arrived at their door, they let her in and it seemed as if Robin was unable to breathe. Nielson testified that Robin was terrified and "couldn't get words out" and that Robin "kept putting her hand up to her chest." 1 RP at 101. Nielson "could tell something was really wrong with her," so they helped Robin to the couch and got her some water. 1 RP at 101. Nielson noticed that both of Robin's eyes were starting to blacken. Nielson also saw Dorothy and Tate driving up and down the road.

After about ten minutes, Robin was able to tell Nielson that she (Robin) had been "attacked" and "beat[en]," and she begged Nielson and her husband to take her home. 1 RP at 102. After Nielson's husband took Robin home, they called 911.

Warnes also testified about helping Robin. He testified that when she arrived, Robin was "frantic," her face was flushed, and "she was starting to form bruising around her eyes." 1 RP at 108. He drove Robin home.

3. Deputy Helton's Testimony

Deputy Helton responded to the 911 call. Deputy Helton first spoke with Warnes, who told Deputy Helton where he had taken Robin.

When the State asked the deputy where he went after contacting Warnes, Deputy Helton responded, "Next we traveled to Wind Mountain RV Park. It was the building that was described as–where she was dropped off and attempted to locate *the victim*." 1 RP at 116 (emphasis added). Defense counsel did not object to Deputy Helton's reference to "the victim."

Deputy Helton testified that when he contacted Robin, she appeared "worked up and disheveled," and he observed "what appeared to be two black eyes forming." 1 RP at 117. Deputy Helton stated that he took several photographs of Robin's injuries that night. He also had Robin complete a statement.

The State moved to admit several of Deputy Helton's photographs. Deputy Helton testified that the photographs were intended to document Robin's injuries. During this testimony, he referred to Robin as "the victim" seven times. Defense counsel did not object to Deputy Helton's references to "the victim."

4. Jarod Tate's Testimony

Jarod testified that he had heard Robin screaming and that he heard her being unable to breathe. He then saw Tate "on top of Robin." 1 RP at 152. Jarod hit his father in an attempt to

protect Robin. After Jarod hit him, Tate got up, "focused on" Jarod, and left. 1 RP at 153. After Tate left, Robin left.

B. DEFENSE WITNESSES

Dorothy and Tate testified for the defense.

1. Dorothy Tate's Testimony

Dorothy testified that she did not see Tate punch Robin, but she did see them on the floor and she saw Jarod split them up. Dorothy further testified that Robin asked for a ride home after this incident. Dorothy, who testified that she had "a very poor memory," admitted that she drove to the second store, but she did not recall going to the first store or why she went to either store. 1 RP at 166.

Dorothy testified that Tate and Robin had been "bickering" and that Robin told her (Dorothy) that she wanted to get out of the car. 1 RP at 176. Dorothy stated that she did not want to let Robin out of the car because she planned to take Robin home, it was dark, and the weather was bad. Dorothy also recalled that while they were in the car, Tate and Robin were "grabbing each other." 1 RP at 171. But Dorothy testified that Robin did not try to climb out one of the window.

Dorothy asserted that she had intended to take Tate home and then take Robin home, but Robin "took off" when they arrived back at the Tates' residence. 1 RP at 171. Dorothy further asserted that she then drove around looking for Robin so she could take her home. She stated that she was alone when she was looking for Robin.

2. Tate's Testimony

Tate testified that he and Robin were both methamphetamine users and that he and Robin were having relationship problems because he no longer wanted to be around methamphetamine and she lied to him about stopping her methamphetamine use. He described having an initially friendly encounter with Robin on February 8, when she came over to get a stapler and asserted that it was her idea to go to the bungalow.

They then had an argument, and Robin said she wanted to go home. He recalled arguing with Robin, but he denied taking any of her property that day. He asserted that he had taken her property a week earlier when Robin had been behaving strangely and that this came up during their argument on February 8.

Tate admitted that he threw some tobacco onto the floor in the laundry room on February 8. He stated that while Robin was cleaning it up, she was upset and started to tell him not to hit her even though he had not intended to hit her. After testifying that Robin had accused him of planning to throw a knife at her a week earlier and that Robin was exhibiting paranoid behavior due to her drug use, Tate admitted that he had punched Robin in the laundry room. He asserted that he hit her because she kept accusing him of attempting to harm her.

Tate further testified that after he hit Robin in the laundry room, they continued to argue in the hallway. He recalled that they "ended upon the ground," but he could not recall why. 2 RP at 189. Tate denied putting his hands on Robin's throat.

Tate further testified that his son then came in and "punched [him] in the head several times." 2 RP at 190. Tate got off of Robin, and Tate's father and Jarod threatened to call the police.

7

Because he had "smacked" Robin, Tate told them to go ahead and call the police. 2 RP at 190. Robin, however, "insisted that" they not call the police. He and Robin then went outside and Robin asked his mother for a ride home. Tate insisted on going with them to replace Robin's tobacco. He also asked his mother to take him to the store to get some beer and a drink for Robin.

When they stopped at the first store, he purchased the beverages. They then headed to another store for the tobacco. When Robin said she did not want any tobacco, he told his mother to take him home.

Tate testified that they turned back before reaching the second store. After they turned back, Robin "started freaking out about wanting out or something" and tried to jump out of the car while it was moving. He asserted that about 20 years earlier, Robin had once jumped out of a stopped car and run into traffic, so he was worried about her jumping out of the car again. He was not sure if he locked the car door, but he told his mother to lock the windows because Robin might try to jump out of one. He admitted that it was "possible" that he put his arm around Robin's neck to try to keep her in the car, but he denied trying to strangle her. 2 RP at 197. Tate stated that when they got back to his parents' house, Robin did not come inside.

### III. Jury Instructions

After the parties rested, the trial court gave the following jury instruction on the unlawful imprisonment charge:

> To convict the defendant of the crime of unlawful imprisonment, as charged in count three each of the following five elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or between February 8, 2017 and February 9, 2017, the defendant restrained the movements of Robin Sue Tate in a manner that substantially interfered with her liberty;

(2) That such restraint was

(a) without Robin Sue Tate['s] consent or

(b) accomplished by physical force, intimidation, or deception and

(3) That such restraint was without legal authority; and

(4) That with regard to elements (1), (2), and (3), the defendant acted knowingly; and

(5) That any of these acts occurred in the State of Washington.

If you find from the evidence that elements (1), (3), (4), and (5), and any of the alternative elements (2)(a), or (2)(b) have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. To return a verdict of guilty, the jury need not be unanimous as to which of alternatives (2)( a), or (2)(b ), has been proved beyond a reasonable doubt, as long as each juror finds that at least one alternative has been proved beyond a reasonable doubt.

On the other hand, if after weighing all the evidence you have a reasonable doubt as to any one of elements (1), (2), (3), (4), or (5), then it will be your duty to return a verdict of not guilty.

CP at 88 (Jury Instr. 17). The State proposed this instruction. Defense counsel did not object to this instruction or request a unanimity instruction related to the unlawful imprisonment charge.

The State proposed unanimity instructions related to each of the two assault charges. The trial court gave the jury the State's proposed unanimity instructions related to each of the two assault charges over defense counsel's objections.

## IV. CLOSING ARGUMENTS

### A. STATE'S CLOSING ARGUMENT

During its closing argument, the State discussed all of the evidence and then addressed the evidence as it related to each charge. When addressing the unlawful imprisonment charge, the State argued:

9

And then Count III–the Unlawful Imprisonment–ladies and gentlemen[,] Dorothy Tate said Robin didn't want to be in the car. Robin said she didn't want to be in the car. Mr. Tate–I think–admitted she didn't want to be in the car. Though he felt she was just being irrational.

The plan was to go to Home Valley. Not travel up to Carson Valley gathering supplies. And when she tried to get out of the car–when she realized they weren't going home she was pulled back in the car–against her will using physical force.

And when she tried to unlock the door–which actually happened prior–it was blocked and the door was held locked so she couldn't get out. And it culminated in the strangulation component.

2 RP at 250-51.

B. DEFENSE'S CLOSING ARGUMENT

In his closing argument, Tate argued that the State had failed to prove strangulation when Tate restrained Robin in the car because he had acted with lawful authority when he kept Robin from getting out of the moving car. Tate then argued,

With that lawful authority–that too is important with the Unlawful Imprisonment. There's a number of elements that the State must prove and they must prove all the elements in order for there to be a verdict of guilty. If they fail to prove any one element the only verdict is not guilty.

The elements I want you–draw attention to is the element three in instruction seventeen. That such restraint was without legal authority. Yes. You heard from Mr. Tate–I was trying to keep her in the car. I was trying to keep her from–again–I'll just say it again–I'll probably say it again in the future–a moving car going down Wind River Highway.

That's not without legal authority. That's with the intent of keeping somebody safe. I hazard to guess what would have happened if oh sure–we let her roll out going thirty-five–she hits the road–gets all banged up–what was . . . the response from the police then?

Oh you were negligent–you were reckless–you caused his person to be harmed. Why didn't you stop it? Oh I didn't want to be charged with an Unlawful Imprisonment. But that's what the State has you pondering. Whether it's lawful

10

or not to keep somebody in a car that is moving down the road. Without that element there can be no lawful–Unlawful Imprisonment.

So without that showing that it's without legal authority this too did not occur and Mr. Tate could not be found guilty of the Unlawful Imprisonment.

2 RP at 260-61.

Tate further argued:

And in closing here I want to again thank you for your time and attention. Go back–look at those elements and see where–without strangulation there can be no Assault II and without a showing that Mr. Tate's actions in the car was without legal authority there can be no Unlawful Imprisonment.

2 RP at 262.

C. STATE'S REBUTTAL ARGUMENT

In its rebuttal argument, the State argued,

Thanks again ladies and gentlemen. As you heard I bear the burden. I need to come back and readdress you one more time.

Counsel was quick to point out how hesitant, quiet, withdrawn *the victim* was as she told the story. The story that–pretty dramatic–what happened to her. I know she also had to tell that story–the Defendant was located right over my shoulder as I asked her the question–staring her down.

2 RP at 262-63 (emphasis added). Defense counsel did not object to the State's reference to "the victim." 2 RP at 262-63.

V. JURY NOTE

During its deliberations, the jury sent a note related to the unlawful imprisonment charge asking the trial court two questions: "Are we considering the evidence in the automobile[?] In the house[?] Or at any time between February 8th and February 9th[?]" 2 RP at 270; *see also* CP at 95. Both parties agreed that the trial court should just refer the jury to the instructions and the

evidence presented. Defense counsel commented that giving the jury any more information would amount to a comment on the evidence.

The trial court responded to the jury as follows: "You are to consider all of the admissible evidence presented at trial. You are to look at the instructions for direction on the law." CP at 95.

## VI. VERDICT AND SENTENCING

The jury found Tate guilty of fourth degree assault and unlawful imprisonment.[5]

At sentencing, the trial court imposed legal financial obligations, including a $200 criminal filing fee. The trial court entered an order of indigency for purposes of appeal. But the trial court did not specify whether it found Tate indigent under RCW 10.101.010(3) (a) through (c) or under subsection (d).

Tate appeals his convictions and the $200 criminal filing fee.

## ANALYSIS

Tate argues that (1) the trial court erred when it failed to give a unanimity instruction related to the unlawful imprisonment charge, (2) defense counsel's failure to object to the deputy's and the State's numerous references to "the victim" amounted to ineffective assistance of counsel, and (3) under the current law, the trial court should strike the $200 criminal filing fee because he is indigent.

## I. UNANIMITY INSTRUCTION NOT REQUIRED

Tate first argues that he was deprived of his right to a unanimous jury verdict because the trial court did not instruct the jury that it had to be unanimous as to what act constituted the

---

[5] The jury found Tate not guilty of second degree assault.

unlawful imprisonment. Because the State elected in closing argument the act it was relying on for the unlawful imprisonment charge, this argument fails.

A.  LEGAL PRINCIPLES

For a conviction to be constitutionally valid, a unanimous jury must conclude that the accused committed the criminal act charged. *State v. Beasley*, 126 Wn. App. 670, 682, 109 P.3d 849 (2005) (citing *State v. Petrich*, 101 Wn.2d 566, 569, 683 P.2d 173 (1984), *modified by State v. Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988)). When multiple incidents are alleged, any one of which could constitute the crime charged, the jury must unanimously agree on which incident constitutes the crime. *Beasley*, 126 Wn. App. at 682. Under these circumstances, unless the State elects which incident it will rely on for the conviction, a trial court must instruct the jury that all 12 jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt. *Beasley*, 126 Wn. App. at 682.

"[A]n election can be made by the prosecuting attorney in a verbal statement to the jury as long as the prosecution 'clearly identifie[s] the act upon which' the charge in question is based." *State v. Carson*, 184 Wn.2d 207, 227, 357 P.3d 1064 (2015) (some alteration in original) (quoting *State v. Thompson*, 169 Wn. App. 436, 474-75, 290, P.3d 996 (2012)). Such verbal election can occur in closing argument. *Thompson*, 169 Wn. App. at 474-75.

We review de novo whether a unanimity instruction is required. *See State v. Boyd*, 137 Wn. App. 910, 922, 155 P.3d 188 (2007). "A constitutional error occurs if the State fails to properly elect the criminal act and the trial court fails to instruct the jury on unanimity." *Beasley*, 126 Wn. App. at 682. Because the failure to give a unanimity instruction is an error of

constitutional magnitude, a defendant may raise the issue for the first time on appeal. *State v. Locke*, 175 Wn. App. 779, 802, 307 P.3d 771 (2013).

B. ELECTION

Tate argues that the State did not elect which of the two alleged instances of unlawful imprisonment it was relying on: the incident in the car or Tate restraining Robin in the house until Jarod intervened. Br. of Appellant at 11-12. We disagree.

In its closing argument, the State expressly linked the unlawful restraint charge to only the incident in the car when it argued:

> And then Count III–the Unlawful Imprisonment–ladies and gentlemen[,] Dorothy Tate said Robin didn't want to be in the car. Robin said she didn't want to be in the car. Mr. Tate–I think–admitted she didn't want to be in the car. Though he felt she was just being irrational.
>
> The plan was to go to Home Valley. Not travel up to Carson Valley gathering supplies. And when she tried to get out of the car–when she realized they weren't going home she was pulled back in the car–against her will using physical force.
>
> And when she tried to unlock the door–which actually happened prior–it was blocked and the door was held locked so she couldn't get out. And it culminated in the strangulation component.

2 RP at 250-51. The State did not refer to any other incident when discussing unlawful imprisonment or suggest in any way that Tate's attack on Robin constituted unlawful restraint.

Additionally, defense counsel recognized this election in closing argument:

> With that lawful authority–that too is important with the Unlawful Imprisonment. There's a number of elements that the State must prove and they must prove all the elements in order for there to be a verdict of guilty. If they fail to prove any one element the only verdict is not guilty.
>
> The elements I want you–draw attention to is the element three in instruction seventeen. That such restraint was without legal authority. Yes. You

14

heard from Mr. Tate–*I was trying to keep her in the car*. I was trying to keep her from–again–I'll just say it again–I'll probably say it again in the future–a moving car going down Wind River Highway.

That's not without legal authority. That's with the intent of keeping somebody safe. I hazard to guess what would have happened if oh sure–we let her roll out going thirty-five–she hits the road–gets all banged up–what was . . . the response from the police then?

Oh you were negligent–you were reckless–you caused his person to be harmed. Why didn't you stop it? Oh I didn't want to be charged with an Unlawful Imprisonment. But that's what the State has you pondering. *Whether it's lawful or not to keep somebody in a car that is moving down the road*. Without that element there can be no lawful–Unlawful Imprisonment.

So without that showing that it's without legal authority this too did not occur and Mr. Tate could not be found guilty of the Unlawful Imprisonment.

2 RP at 260-61 (emphasis added). At no time in his closing did defense counsel suggest that the unlawful imprisonment occurred at any other time. Thus, we hold that the State clearly elected the act that constituted the unlawful imprisonment charge in its closing argument.

Tate suggests that the State's argument regarding Jarod's intervention in Tate's assault on Robin demonstrated that the State did not elect the action that was the basis of the unlawful imprisonment charge. We disagree.

The State's argument regarding Jarod's intervention in Tate's assault on Robin was as follows:

Mr. Tate gave illusions as to drug use and things like that-that might explain [Robin's] paranoia. It quite obviously explained her fear of him. It was this cyclical nature to the assault here.

. . . .

[Robin] goes into the kitchen and then there's some sort of argument–Robin said that it had to do with accusations that [s]he had used [his] mom's phone for

some sort of e-mail purpose and she said no I didn't do that. (Clap!) Boom–tackle–on the floor. Punched in the chest-choking.

And the one gallant act comes from Jarod Tate who really wanted to stay out of this. He heard it earlier–half an hour earlier when they were in the laundry room. He's just trying to play video games. He's trying to keep his head down.

But now he hears the screaming and he hears what's going on and he walks out–he sees what's going on. He does the right thing. He gets his dad off of her. He punches dad in the head and gets him off of her.

This cyclic violence-very good basis for paranoia. As far as the impact of drug use-possible. It's also irrelevant when it comes to whether or not someone assaulted someone else.

2 RP at 25153.

Reading this argument in context, it is clear that the State was discussing this assault in the context of one of the assault charges and to attempt to explain why Robin may have appeared paranoid or afraid of Tate, not in the context of explaining the basis of the unlawful imprisonment charge. The State never expressly related this assault or Jarod's assistance to the unlawful imprisonment charge. Instead, it expressly related this argument to "whether or not someone assaulted someone else." 2 RP at 253.

Additionally, the State's argument expressly related the assault in which Jarod interfered to the second degree assault charge:

So again going back to the counts we have like three counts–Assault II Strangulation. Assault IV is in that car that arm was wrapped around her neck and she could not breathe and she was pulled back in the back. Ms. Robin Tate was strangled.

We have a separate allegation–she says she was back in the house and on the kitchen floor Mr. Tate was on top of her. Now he says it was a spooning position.

16

> But both Robin and Jarod Tate–who have nothing to gain from this–he lives with the grandma, Dorothy at that same location. And it's his dad he's talking about here. He said he was on top of her. But Robin Tate testified he was on top of me and he was choking her again. Two separate possibilities for 2 Assault II.
>
> Ladies and gentlemen you have to be unanimous in–in which one. So if you find that there was strangulation in this case you have to be unanimous on those two–one of those two incidents.

2 RP at 249-50. Thus, Tate does not show that the State failed to elect the act related to the unlawful imprisonment charge.[6]

Because the State elected in closing argument, Tate's unanimity argument fails.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

Tate next argues that he received ineffective assistance of counsel because his attorney failed to object to the several references to "the victim." This argument also fails.

## A. LEGAL PRINCIPLES

To prevail on a claim of ineffective assistance of counsel, Tate must show both (1) that defense counsel's representation was deficient, and (2) that the deficient representation was prejudicial. *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011). Representation is deficient if, after considering all the circumstances, the performance falls "'below an objective standard of reasonableness.'" *Grier*, 171 Wn.2d at 33 (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984)). Prejudice exists if there is a reasonable

---

[6] Tate also mentions the jury's question to the trial court regarding what evidence it was to consider in relation to the unlawful imprisonment charge. But Tate's argument on this point relates to whether or not the failure to elect was harmless, not to whether there was in fact an election. The jury's apparent confusion does not establish that the State failed to elect in closing argument.

probability that, except for counsel's errors, the results of the proceeding would have differed. *Grier*, 171 Wn.2d at 34.

B.  NO PREJUDICE

Even presuming, but not deciding, that defense counsel should have objected to Deputy Helton's eight references and the State's single reference to Robin as "the victim," Tate fails to show that the failure to object was prejudicial.

Deputy Helton's repeated references to "the victim" were contrary to the trial court's ruling.  But in light of all of the evidence, including Robin's and Jarod's testimony, and Tate's own admission that he had struck Robin, Deputy Helton's references to "the victim" were not prejudicial.

Furthermore, the use of the term "victim" by the State during its rebuttal closing argument was not prejudicial.  In this context, the State's characterization of Robin as the "victim" was legal argument based on the evidence.

As a whole, taken in context, the use of the term "victim" was not prejudicial.  Accordingly, this ineffective assistance of counsel claim fails.

### III.  CRIMINAL FILING FEE

In a supplemental brief, Tate argues that under the current law we should vacate the $200 criminal filing fee because he is indigent.  The State did not respond to this argument.

At sentencing, the trial court imposed as a mandatory LFO a $200 criminal filing fee.  In 2018, our legislature amended RCW 36.18.020(2)(h), which now prohibits imposition of the criminal filing fee on "a defendant who is indigent as defined in RCW 10.101.010(3) (a) through

(c)." Laws of 2018 ch. 269 § 17. In *State v. Ramirez*, our Supreme Court held that this amendment applies prospectively to cases pending on direct appeal. 191 Wn.2d 732, 426 P.3d 714 (2018).

RCW 10.101.010(3) provides:

"Indigent" means a person who, at any stage of a court proceeding, is:

(a) Receiving one of the following types of public assistance: Temporary assistance for needy families, aged, blind, or disabled assistance benefits, medical care services under RCW 74.09.035, pregnant women assistance benefits, poverty-related veterans' benefits, food stamps or food stamp benefits transferred electronically, refugee resettlement benefits, medicaid, or supplemental security income; or

(b) Involuntarily committed to a public mental health facility; or

(c) Receiving an annual income, after taxes, of one hundred twenty-five percent or less of the current federally established poverty level; or

(d) Unable to pay the anticipated cost of counsel for the matter before the court because his or her available funds are insufficient to pay any amount for the retention of counsel.

Here, the trial court found that Tate was indigent for the purposes of appeal at the time of sentencing, but it did not specify whether it found Tate indigent under RCW 10.101.010(3)(a) through (c), or whether it found him indigent under subsection (d). If the trial court found Tate indigent under RCW 10.101.010(3)(d), rather than under subsections (a) through (c), RCW 36.18.020(2)(h)'s prohibition on imposing the criminal filing fee does not apply. Because we cannot determine what the basis of the indigent finding is, we remand to the trial court to reconsider whether to impose the criminal filing fee under RCW 36.18.020(2)(h).

No. 50410-3-II

CONCLUSION

Because the State elected which act constituted unlawful imprisonment and Tate fails to show that defense counsel's failure to object to the references to "the victim" was prejudicial, we affirm the convictions. But we remand for the trial court to determine whether Tate is indigent under RCW 10.101.010(3)(a), (b), or (c), and whether it can impose the criminal filing fee under RCW 36.18.020(2)(h).

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

LEE, A.C.J.

NEVIN, J.P.T.