2015 DEC 28 AM 11: 43


# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71956-4-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| LARRY D. DALEY JR., | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant | ) | FILED: December 28, 2015 |

SPEARMAN, C.J. — Larry Daley Jr. was convicted of four counts of assault in the first degree after a shooting incident outside a nightclub. He was charged with one count against a "John Doe" after firing at a group of unidentified individuals, and the remaining three counts for shooting at three different officers. He appeals his convictions. With regard to the conviction for assault against "John Doe," Daley argues that because the State was not required to prove the identity of the person he intended to assault, it failed to prove each element of the charged crime beyond a reasonable doubt, violated his right to a unanimous verdict and the prohibition against double jeopardy. With regard to the convictions for assaults against the officers, Daley claims the evidence is insufficient to establish guilt beyond a reasonable doubt. Finding no error, we affirm.

## FACTS

Early on November 25, 2012, Seattle Police Department detectives Benjamin Hughey, Jonathan Huber, and Thomas Janes responded to a request for assistance at the now defunct Citrus nightclub on Fairview Avenue. Fights had broken out during the evening and a large crowd had gathered outside as the club was closing. The detectives arrived in a single car and parked opposite the nightclub on the far side of Fairview Avenue.

They saw a group of three to five men walking along Fairview Avenue following a man in a white hooded sweatshirt. The man in the sweatshirt was later identified as the defendant, Larry Daley Jr. Daley and the group of men appeared to be having a heated argument. Daley stepped into the street and began to cross Fairview Avenue. The group followed him into the street, where they exchanged gestures and yelled back and forth.

The detectives saw Daley suddenly turn back toward his pursuers and reach toward his waistband with his right hand. He then drew out his arm, elbow raised, in a motion that the detectives immediately recognized as drawing a firearm. Daley extended his hand and leveled a nine millimeter semiautomatic pistol directly at the group of men. He was only about ten feet from the men when he fired multiple shots directly at them, with a crowd of club patrons behind them. Detective Hughey testified that he "only remember[ed] one distinct round." Verbatim Report of Proceedings (VRP) (3/20/14) at 61. One of the Citrus employees heard three to six rounds being fired toward the club. A security guard heard "a spurt of four or five shots." VRP (3/27/14) at 68. The group of men

2

scattered and were never identified. The crowd erupted into chaos—yelling and screaming, with drivers "peeling out" in their cars to get away. VRP (3/27/14) at 140-141.

As the detectives got out of the vehicle, Janes shouted, "Stop, Police!" while Hughey ran to intercept Daley. VRP (3/20/14) at 67-68. Daley looked in the direction of the detectives, but then turned back and fired additional shots at the fleeing men and the crowd. He then sprinted toward the detectives. As the distance between Daley and Hughey closed to approximately twenty yards, Daley raised his gun and pointed it directly at Hughey. In that moment, Hughey believed that Daley was about to shoot him. Hughey raised his own service weapon and sighted Daley, firing twice as Daley veered past him onto Yale Avenue—running above and behind the detectives' position.

Daley then had the high ground on Yale Avenue, in position to present a deadly threat to the detectives. Hughey ran over to the retaining wall and spotted Daley, still in possession of his weapon, through some rhododendrons. Hughey fired additional shots at Daley as he continued to run up Yale Avenue. Meanwhile, Huber and Janes had come around the vehicle to get a better angle on Daley. As Daley crossed their line of sight on the opposite side of the rhododendrons, Huber saw Daley turn and point his gun directly toward him and Janes. Huber immediately felt that his life was in danger and fired several shots at Daley.

In that same moment, as Huber fired at Daley, Janes saw two amber muzzle flashes coming from Yale Avenue, between the rhododendron bushes

3

that lined the street. Janes actually felt and heard the bullets pass by his head, recalling the distinctive pop and whiz sound caused by the projectiles breaking the sound barrier. Janes thought that either he or Huber was going to die and yelled for Huber to take cover.

Meanwhile, Hughey ran to the back of the parking lot to access a ramp leading up Yale Avenue. When he reached the ramp, he did not see Daley at first until he turned his weapon mounted flashlight on the rhododendron bushes. He saw Daley in the bushes and heard him call out, "I'm shot, I'm dying." VRP (3/20/14) at 89. Hughey yelled at him to keep his hands up, then called out to Huber and Janes that he had the suspect.

Huber ran to provide cover, while Hughey ordered Daley out of the bushes. Daley no longer had his gun and indicated that he had left it in the bushes. Hughey found the gun where Daley had indicated. Forensic investigators recovered several spent nine millimeter shell casings from the area near Fairview Avenue, three of which matched Daley's pistol. Also recovered under the rhododendron bush where Daley was arrested were two matching casings.

Detectives Hughey and Janes later viewed security footage from cameras on the Fred Hutchinson campus. The footage, played at trial, showed Daley running across Fairview Avenue and up Yale Avenue, as Hughey fired at him. Exhibit 2, Camera 072 at 1:56:48 a.m.-1:57:07 a.m. At 1:57:11 a.m., the video showed a muzzle flash from Daley's location. Exhibit 2, Camera 081 at 1:57:11 a.m.; Appendix E (Screen shot of muzzle flash). The video then shows Daley running and crouching in the bushes along the side of the research center.

4

Exhibit 2, Camera 072 at 1:57:12 a.m-1 a.m. At 1:57:22 a.m., the video shows Daley firing a final shot from the bushes at Hughey—in the top right corner of the frame. Exhibit 2, Camera 072 at 1:57:22 a.m.; see also Appendix F (Screen shot of final muzzle flash—Shot fired at Hughey).[1]

The State charged Daley with four counts of assault in the first degree, while armed with a firearm. In count one, the State alleged that Daley, with intent to inflict great bodily harm, did assault "John Doe" with a firearm and force and means likely to produce great bodily harm or death. Clerk's Papers (CP) at 12. The State made the same allegation as to the three Seattle Police Department detectives in counts two through four.

Daley waived his right to a jury trial. The trial court found Daley guilty of all four counts of first degree assault and imposed a standard range sentence.

## DISCUSSION

Daley argues that because the statute establishing the crime of first degree assault is a specific intent crime, it should be read to "require[ ] proof beyond a reasonable doubt that the defendant had the specific intent to assault an identified victim." Br. of Appellant at 12. Because the State failed to do so, he argues that his conviction for first degree assault on "John Doe" violated his due process rights to hold the State to proof beyond a reasonable doubt as to each

---

[1]Daley moves to strike the State's Appendices D, E, and F, arguing that they are altered and captioned screenshots that were neither part of the record nor submitted with permission from the court. RAP 10.3(a)(8) provides that "[a]n appendix may not include materials not contained in the record on review without permission from the appellate court, except as provided in rule 10.4(c)." We deny Daley's motion to strike the State's Appendices D, E, and F, because they were provided to illustrate testimony in the record where witnesses at trial indicated locations of events on a screenshot of the security video.

element of the charged crime, to not be placed in jeopardy twice for the same offense, and to a unanimous verdict. The State argues that the statute does not require it to prove the identity of a named victim, but only that Daley assaulted another with a firearm with the intent to inflict great bodily harm.

We review questions of statutory interpretation de novo. State v. Ervin, 169 Wn.2d 815, 820, 239 P.3d 354 (2010). RCW 9A.36.011(1)(a) provides in relevant part: "A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm: (a) Assaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death...." Thus, first degree assault has four elements: that the defendant, with (1) intent to inflict great bodily harm, (2) assaulted (3) another (4) with a firearm. State v. Elmi, 166 Wn.2d 209, 215, 207 P.3d 439 (2009). The mens rea required to prove first degree assault is the specific intent to inflict great bodily harm. Id. By the statute's own terms, there is no express requirement for proof of specific intent to assault an identified victim as Daley claims. And we have already held that the name of a victim is not an element of the crime of assault. State v. Plano, 67 Wn. App. 674, 679-680, 838 P.2d 1145 (1992). Daley cites Elmi and State v. Thomas, 123 Wn. App. 771, 779, 98 P.3d 1258 (2004) as authority for his argument that proof of specific intent to assault an identified person is required. But neither case supports his position.

In Elmi, the defendant was convicted of four counts first degree assault with a firearm when he fired shots into the home of his estranged wife, where their child and her two young siblings were present. 166 Wn.2d at 211. On

appeal, he challenged his convictions as to the children, because he was unaware of their presence in the house. Id. The court affirmed the convictions, holding that "once the intent to inflict great bodily harm is established, usually by proving that the defendant intended to inflict great bodily harm on a specific person, the mens rea is transferred under RCW 9A.36.011 to any unintended victim." Id. at 218. The case is of no help to Daley because the Elmi court identified the necessary proof for first degree assault as that demonstrating an intent to inflict great bodily harm. And while the court also observed that the mens rea of first degree assault is "usually" established by proving an intent to harm a specific person, it did not hold, as Daley suggests, that proof of the identity of the intended victim was a necessary element.

In Thomas, we addressed when expert testimony supporting a diminished capacity defense is admissible in a first degree assault case. 123 Wn. App. at 778-79. We concluded that the evidence may be admissible when specific intent or knowledge is an element of the charged crime and noted that assault in the first degree includes a specific intent element, the intent to inflict great bodily harm. Id. Thomas is inapposite because we did not address the issue Daley raises here, whether the crime also requires proof of intent to harm a specific person.

In support of its argument that such proof is not required, the State cites People v. Griggs, 216 Cal. App. 3d 734, 265 Cal. Rptr 53 (1989), a case with facts remarkably similar to this one. In Griggs, a crowd was leaving an auditorium after a concert and streaming into a parking lot. An undercover officer assigned

to patrol the area saw the defendant, Griggs, pull out a revolver and fire at least two shots into a large crowd of people. No one was injured and no victims were identified. Griggs was charged with and convicted of assault with a deadly weapon.[2] On appeal, he argued that the trial court erred when it denied his motion for acquittal in which he contended that the name of the victim is a material element of the charged crime and the no proof had been offered to satisfy that element. The Griggs court rejected the argument, concluding that the identity of the victim under these circumstances was not an element of the crime to be proven at trial.

> "All that is necessary is that there is a victim, the characteristics of the victim are not critical elements of the offense. The law is seeking to punish the reckless disregard of human life, and what needs to be shown is that a human life was threatened in the manner proscribed .... [w]e conclude the naming of the particular victim is not an element of assault with a deadly weapon[.]"

Griggs, 216 Cal. App. 3d at 742. We agree. Similar to the issue in Griggs, the question here is whether the defendant assaulted another with a firearm while intending to inflict great bodily harm. The identity of the victim is irrelevant to this question because whether the victim was injured or placed in fear by the defendant's actions are not elements that need to be proved or disproved. The State's burden is to prove that "another" was assaulted in the manner provided by statute. The identity of the assaulted person is not necessary to establish that the crime has been committed.

---

[2] In California, assault with a deadly weapon is a general intent crime requiring only the intent to commit a battery, not the specific intent to cause any specific degree of injury or harm as is required in Washington. Griggs, 216 Cal. App. 3d at 740.

Daley also argues that the constitutional prohibition against double jeopardy requires identification of a specific victim, but cites no authority to support his argument. The State argues that a double jeopardy claim is hypothetical and not ripe for review. In such an unlikely event, Daley would not be limited in his ability to raise it as a defense against additional charges arising out of this incident.

Daley cites Edmund v. State, 398 Md. 562, 921 A.2d 264 (2007) and State v. Crank, 105 Utah 332, 142 P.2d 178, 180 (1943), to support his argument that due process requires a "quantum of specificity to identify an intended victim." Br. of Appellant at 12. In Edmund, the defendant did not know the victim's name but stated that "he had an ongoing problem with [him]." 921 A.2d at 266. The Edmund court found that the charging documents, without the victim's name, sufficed to provide defendant with notice that he was charged with a first degree assault that took place on January 20, 2005, the day of his arrest. Id. at 267. In Crank, the defendant also challenged the sufficiency of the information for failing to name the individual allegedly murdered and/or describe him with sufficient detail to avoid the possibility of double jeopardy. In that case, the court found that there was no requirement to name the victim if his identity was unknown, but that facts must be supplied "to identify the victim, to enable the defendant to prepare his defense, and to identify the crime." Edmund 921 A.2d at 271.

These cases are of no help to Daley because he does not claim that he did not receive fair notice of the charges against him, only that a lack of identifying information puts him at risk for successive prosecutions for the same

9

incident. Moreover, both Crank and Edmund expressly dispel any concern about double punishment, because the defendants would have the entire record of the case to allow them to raise such a defense if the occasion to do so arose. The Crank court found that for the purposes of double jeopardy, the identity of the offense "may also be established by evidence, when the pleadings do not satisfactorily show the identity." Crank, 142 P.2d at 180. And in Edmund, while the victim there was described with some specificity, the court noted that "[e]ven if the State were to initiate such a prosecution, Mr. Edmund, in support of a defense of *autrefois convict*,[3] could use the entire record of this cause. He would not be limited to the allegations of the indictment, as amended." Edmund, 921 A.2d at 273.

We agree with the State that double jeopardy issues are extremely unlikely to arise. And, in the event that they do, while Daley may not have the names or physical descriptions of the men in the group, he may rely on the entire record of this case to raise double jeopardy as a defense to any new charges based on this incident. We conclude that the failure to identify the individuals does not implicate any constitutional concerns regarding double jeopardy.

Daley also argues that his due process right to a unanimous verdict demands an identified, intended victim. He cites State v. Stephens, 93 Wn.2d 186, 188, 607 P.2d 304 (1980), where the jury was instructed in the disjunctive to determine whether the defendant assaulted one of the victims or the other. In

---

[3] "A plea in bar of arraignment that the defendant has already been convicted of the offense. This plea can be asserted in the alternative with a plea of not guilty." BLACK'S LAW DICTIONARY, 1340 10th ed. (1995).

<u>Stephens</u>, the court found that the instruction split the action into two separate crimes – assault against victim one and assault against victim two – and would have allowed conviction if , e.g. "six jurors believed Stephens assaulted [victim one] and six believed he assaulted [victim two]." <u>Id.</u> at 190. This argument is also purely speculative and hypothetical. Daley waived his right to trial by a jury and thus, his right to a unanimous verdict.

We hold that the State was not required to identify the particular men in the group or to identify one of them as the intended target. The State was only required to prove that Daley assaulted another using a firearm with the intent to inflict great bodily harm. The evidence is more than sufficient to support the trial court's conclusion that he did so beyond a reasonable doubt. There was no error.

Next, Daley argues that the record contains insufficient evidence to sustain his convictions of assault against Detectives Janes, Huber, and Hughey. Br. of Appellant at 18-19. He argues that there was insufficient corroborating or circumstantial evidence to prove beyond a reasonable doubt that he was the individual who shot at the detectives. Daley also challenges the trial court's findings of fact 7, 8, and 12, claiming that the trial court misinterpreted the security videotapes and erroneously found that he had assaulted the three officers.

The State must prove beyond a reasonable doubt the identity of the defendant as the individual who committed the offense. <u>State v. Thomson</u>, 70 Wn. App. 200, 211, 852 P.2d 1104 (1993), <u>aff'd</u>, 123 Wn.2d 877, 872 P.2d 1097 (1994). In testing the sufficiency of the evidence, we draw all reasonable

inferences from the evidence in the State's favor. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Again, we defer to the trier of fact on issues of the credibility of witnesses, resolving issues of conflicting testimony, and the persuasiveness of the evidence. State v. Thomas, 150 Wn.2d 821, 874–75, 83 P.3d 970 (2004) abrogated in part on other grounds by, Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed .2d 177 (2004). "Circumstantial evidence and direct evidence have equal weight." State v. Beasley, 126 Wn. App. 670, 689, 109 P.3d 849 (2005) (citing State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980)).

Daley argues that the State failed to prove that he was the shooter because no one saw him fire his gun after he ran across Fairview Avenue North, and that neither detective testified that they actually saw Daley pull the trigger. There is more than enough circumstantial evidence in the record, however, for a reasonable fact finder to find that Daley shot at all three detectives that night.

Janes testified that he was heading toward Hughey's location at the loading dock ramp when he saw two amber flashes coming his direction. VRP (3/27/14) 76. He explained that visible amber is "a fire from when a shell is expelled out of a weapon, you get the flameout from the barrel." VRP (3/27/14) at 77. He also testified that he felt the whizzing of two bullets coming past him, and identified the sounds as such based on his prior experience of being fired upon while on a SWAT team. He indicated on a photo that the muzzle flashes were coming from between some rhododendron bushes. Upon review of the security tape showing a flash of light, Janes identified that the light on the tape came from

the area where he noticed the two amber flashes. Janes also testified that he was "100 percent" confident that Daley was the person in the white sweatshirt. Id. at 95.

Detective Huber testified that he got out of the car and focused on Daley immediately after he saw him pull out a gun and fire shots at the group. When Daley ran past him, Huber saw Daley "turn and look at [him] and point the gun in [his] direction." Id. at 143. Huber testified that at that point he was "scared" and concerned for his own safety." Id. at 144. According to Janes, Huber was also right next to Janes when he saw the amber flashes and heard the bullets whiz past their heads.

Detective Hughey testified that after Daley shot at the group, he began to run toward the officers and saw "his firearm raised and pointed at me." VRP (3/20/14) at 68. Hughey thought at that point he "was going to get shot, possibly killed, so I made the decision to defend my life and I made the decision to shoot at Mr. Daley before he could shoot me." Id. at 71. He further testified that he did not have any independent recollection of Daley shooting at him. Upon viewing the video, it "scared the heck out of [him]," because he "had no memory [himself] of being shot at," but "[w]hen you see the video, you see me getting shot at, which obviously it really – after the fact, it scares you. You're like oh, wow, somebody really did try to kill me." Id. at 111-112.

Daley argues that there is insufficient evidence that he assaulted Janes and Huber, because no bullets or casings were found at or near where Janes saw muzzle flash. He also argues that the security tape showing muzzle flash

13

No. 71956-4-I/14

near him is inconclusive, because you can see only one flash on tape, not two flashes as Detective Janes testified. According to Daley, there is insufficient evidence as well that he assaulted Hughey, because Hughey testified that numerous other people were running on Yale Avenue North and that he was unaware of being fired upon until he viewed the security videotape. The trial court heard all of this evidence and is entitled to deference on issues of credibility and conflicting evidence. We find that there is sufficient evidence in the record to support Daley's convictions and affirm.

Affirmed.

WE CONCUR:

Spearman, C.J.

Appelwick, J.

Cox, J.

14