## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58746-7-II |
| Respondent, | |
| v. | |
| MARGIE CRUZ, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—Margie and Simeon Cruz[1] were foster and adoptive parents to five children. After years of living in the Cruzes' house, the children reported extensive physical and sexual abuse at the hands of Margie and Simeon, and they were taken into protective custody. The State charged Margie with multiple counts of first degree assault of a child, 1 count of first degree molestation of a child, and 2 counts of animal cruelty. The charging periods for each crime spanned many years.

Margie and Simeon were codefendants at trial. In closing arguments, the State discussed multiple instances of child assault for each victim and each defendant, but it failed to elect which of Margie's and Simeon's many alleged acts jurors should rely on when considering each individual child assault charge. The State also failed to propose, and the trial court did not give, an instruction that the jury needed to be unanimous as to which of Margie's and Simeon's acts it

---

[1] For clarity, we refer to the defendants by their first names.

relied on to convict for each charge. The State concedes this was a constitutional violation of Margie's and Simeon's rights to jury unanimity.[2]

The jury convicted Margie of 2 counts of second degree child assault, 1 count of fourth degree child assault, and 1 count of second degree animal cruelty against the family dog. Based on the jury's guilty verdicts, the trial court sentenced Margie to 61 months with 18 months of community custody and imposed several community custody conditions.

The State concedes on appeal that its failure to elect specific instances of child assault in the absence of a unanimity instruction was constitutional error. However, the State argues that this error was harmless for all counts of child assault.

The failure to elect specific instances or provide a unanimity instruction is only harmless if no rational juror could have reasonably doubted any of the alleged instances of the crime. *State v. Coleman*, 159 Wn.2d 509, 512, 150 P.3d 1126 (2007). This standard ensures that a defendant is not deprived of their constitutional right to a unanimous verdict because some jurors believed that certain alleged instances occurred, while others did not believe that those instances occurred and voted to convict based on other instances.

We accept the State's concession of error. Because the State discussed so many instances of child assault in closing without making an election, and because there was conflicting testimony regarding some instances, we conclude that a rational juror may have reasonably doubted some of the alleged instances for one of the second degree child assault convictions and the fourth degree child assault conviction. Accordingly, we conclude the State's error was not harmless for those counts. We reverse those convictions and remand for a new trial.

---

[2] Simeon's convictions are addressed in a separate opinion.

In contrast, because we find no conflicting testimony raising reasonable doubt as to the alleged instances that supported one of the second degree child assault convictions, we find the unanimity error to be harmless with regard to that count.

Margie also challenges several evidentiary decisions and jury instructions, none of which constitute reversible error. Additionally, she appeals one of her community custody conditions, which we uphold. Thus, we reverse in part and affirm in part. We affirm one second degree child assault conviction and the second degree animal cruelty conviction. We reverse one second degree child assault conviction and the fourth degree child assault conviction. We remand to the trial court for a new trial on the reversed convictions and resentencing on the remaining convictions in accordance with our opinion.

FACTS

I. BACKGROUND

Margie's case is linked with her husband, Simeon Cruz's case on appeal. Margie and Simeon were tried as codefendants, and Simeon adopted all of Margie's arguments on appeal in his briefing. Accordingly, because many of the issues are similar or identical between the cases, we adopt by reference the facts stated in Simeon's opinion and repeat or add additional facts only where necessary to Margie's appeal.[3]

---

[3] Because this is a linked case with codefendants, the records on appeal overlap significantly. The content and pagination of the trial transcripts are identical between the two cases. And the Clerk's Papers contain many of the same documents. Where we cite to briefs or Clerk's Papers from the other case, 58911-7-II, we indicate the case number accordingly.

Margie and Simeon were foster parents, and eventually adoptive parents, to four children: KC (a boy born in 2004); AC (a boy born in 2008); ZC (a girl born in 2009); and JC (a girl born in 2010). They also fostered MR (a girl born in 2004) for two years. Additionally, Margie and Simeon had two pets: a dog named Pepper and a cat named Misty.

On July 7, 2020, KC snuck out of the Cruzes' house and reported Margie's and Simeon's treatment of him and his siblings to a neighbor. The neighbor called the police, who arrived at the Cruzes' house and put the children under protective custody.

On July 9, police arrested Margie and Simeon Cruz at their house. After being taken into state custody, the children were medically examined and participated in forensic interviews. Both the nurse examiner and the forensic interviewer later testified at trial.

The children described the Cruz household as an environment of constant and serious physical and sexual abuse. The alleged instances of abuse are too numerous to list, so we focus on the instances that the State relied on for each charge.

The children stated that Margie and Simeon would consistently beat them with their hands and other household objects, including wire brushes, belts, brooms, and toys. And to punish the children for perceived bad behavior, Margie and Simeon would force them to kneel on sharp objects like cheese graters and uncooked rice or sleep on cold surfaces without bedding like uncarpeted floor or in the garage during winter. The children explained that this kind of abuse occurred almost daily. Some of them alleged being forced to take ice baths or cold showers as punishment.

The children also described how Margie and Simeon treated Pepper and Misty. Relevant here, the children said that Margie and Simeon would kick Pepper and Simeon repeatedly used a shock collar on Pepper.

The State charged Margie with several crimes with long charging periods, some extending more than a decade:

- Count I: first degree child assault of JC between November 30, 2010, and July 7, 2020.[4]
- Count II: first degree child assault of AC between April 22, 2008, and July 7, 2020.[5]
- Count III: first degree child assault of ZC between January 29, 2009, and July 7, 2020.[6]
- Count IV: second degree animal cruelty of Pepper between January 1, 2004, and July 9, 2020.
- Count V: second degree animal cruelty of Misty between January 1, 2004, and July 9, 2020.[7]
- Count VI: first degree child molestation of ZC between January 1, 2016, and July 7, 2020.[8]

## II. TRIAL

### A.    Pretrial Motions

Before trial, the court granted defense counsel's motion requesting that the child victims not use the word "'torture'" to describe what occurred to them. Clerk's Papers (CP) at 47. But this ruling did not address testimony from other witnesses.

### B.    Children's Testimony

Generally, JC testified that Margie hit her, once loosening one of her teeth, and made her kneel on sharp objects. JC also testified that Margie made her sleep on the floor and in the garage without blankets and sometimes put her in cold showers with ice. AC testified that Margie hit him

---

[4] The jury convicted of a lesser included crime of second degree child assault.
[5] The jury convicted of a lesser included crime of second degree child assault.
[6] The jury convicted of a lesser included crime of fourth degree child assault.
[7] The trial court dismissed this charge with prejudice upon a motion from the State.
[8] The jury found Margie not guilty of this charge.

with her hands and with other household objects, including an Iron Man toy. AC also stated that Margie strangled him, starved him, forced him to kneel on sharp objects, and forced him to sleep in cold and uncomfortable places, like the bathtub or the garage. ZC testified that Margie slapped her and hit her with belts, broomsticks and "anything that was in the line of sight." 5 Verbatim Rep. of Proc. (VRP) at 2109. ZC also stated that Margie forced her to kneel on rice. Additionally, ZC testified that Margie would touch her inappropriately in the shower.

Additional testimony about specific instances of abuse is addressed below in the relevant portions of the analysis.

C.      Testimony of the Forensic Interviewer and Nurse Practitioner

During trial, the State called Sue Villa, the forensic interviewer who interviewed the children, as a witness. Villa testified that a forensic interview is generally "designed to be non-leading and just gather information provided by the child to document whatever it is they have to say about whatever they've experienced." 4 VRP at 1813. Villa stated that during forensic interviews with children, she explains that the child should only tell the truth and tries to use mostly open-ended questions instead of leading or yes-or-no questions.

Villa also testified that it was very unlikely that a child could disclose every relevant memory of abuse during a single forensic interview, stating, "Because in my experience that's not how memory works. It tends to come out a little bit more over time." 4 VRP at 1857. Additionally, "[n]ot all children are ready to talk about everything in the first interview," and the interviews are often time limited. 4 VRP at 1843. Accordingly, Villa stated that she does not ask children "is that everything that's ever happened to you[?]" or equivalent questions during forensic interviews. 4 VRP at 1857.

During trial, the State called Lisa Wahl, a nurse practitioner, to testify as a medical fact witness because she examined the children while they were in state custody. The State asked Wahl to describe her training in "the medical field of torture." 5 VRP at 1872. Wahl explained the definition of child torture and provided clinical criteria for diagnosing when a person has experienced torture. She explained that child torture involves more than attempts to change behavior; it instead involves attempts to dehumanize the child. She described the specific clinical elements involved in a child torture diagnosis, which included multiple or prolonged instances of abuse combined with at least two factors that establish the necessary dehumanization.

After detailing the children's disclosures and physical symptoms, Wahl testified that she assessed AC with "[c]hronic and severe physical abuse with torture" based on her "training and experience." 5 VRP at 1912. She diagnosed ZC with "[p]hysical abuse." 5 VRP at 1918. Wahl said that her diagnosis of JC was that she had been "sexually abused and she was tortured." 5 VRP at 1923.

Defense counsel moved to strike Wahl's testimony "related to sexual abuse" for all of the children she discussed because Wahl was not an expert and improperly gave her opinion as to the ultimate issue. *Id.* Defense counsel did not object to the statements that AC and JC were tortured. The trial court denied the motion to strike, concluding that Wahl gave permissible testimony about her diagnoses.

D.      Margie's Testimony

Margie denied ever assaulting or molesting any of the children or pets. During trial, AC stated that Margie hit him with a "thick plastic Iron Man doll[]," breaking the doll. 4 VRP at 1491.

AC said that the resulting marks lasted for more than a day. In her testimony, Margie stated that she gave away AC's Iron Man toy to Goodwill because they were moving and had too many toys.

E.      Jury Instructions

The trial court instructed the jurors that they were not required to accept opinions from witnesses with special training or experience and should consider the credibility of these witnesses based on a number of factors.

The trial court determined that second, third, and fourth degree child assault were lesser included offenses of first degree child assault. Therefore, the trial court gave instructions defining each relevant degree of assault of a child. The trial court told the jury that an individual is guilty of first degree child assault if they are eighteen or older, the child is under the age of thirteen, and

> the person intentionally assaults the child and causes *substantial bodily harm*, and the person has previously engaged in a pattern or practice either of assaulting the child which has resulted in bodily harm that is greater than transient physical pain or minor temporary marks, or causing the child physical pain or agony that is equivalent to that produced by torture.

CP at 34 (No. 58911-7) (emphasis added); *see also* RCW 9A.36.120.

The trial court instructed the jury on second degree child assault, which is the same as first degree child assault except the level of harm inflicted must be "bodily harm that is greater than transient physical pain or minor temporary marks," rather than "substantial bodily harm." CP at 42 (No. 58911-7); *see also* RCW 9A.36.130.

The trial court instructed the jury that fourth degree child assault requires that the defendant assaulted the child. Relevant here, an assault is an intentional touching with unlawful force that is harmful or offensive or an intentional act to inflict bodily injury upon another, regardless of whether there is any resulting physical injury. An assault is also defined as an intentional act to

create a reasonable apprehension and imminent fear of bodily injury in another. "Bodily injury" means "physical pain or injury, illness, or an impairment of physical condition." CP at 28 (No. 58911-7).

The trial court instructed the jury that a defendant is guilty of second degree animal cruelty

if, under circumstances not amounting to first degree animal cruelty, the person knowingly, recklessly, or with criminal negligence inflicts unnecessary suffering or pain upon an animal and/or failed to provide necessary shelter, rest, sanitation, space, or medical attention for the animal and as a result the animal suffered substantial and unjustifiable physical pain.

CP at 64 (No. 58911-7). This instruction, which the State proposed, omitted language requiring the defendant to be an owner of the animal under the second prong of the definition regarding failure to provide necessary shelter, rest, sanitation, etc. *See* Former RCW 16.52.207(2)(a) (2020).

For all counts, the State did not propose, and the trial court did not provide, an instruction informing the jurors that they needed to be unanimous as to which specific act or instance constituted the basis for each count, commonly called a *Petrich* instruction. *See State v. Petrich*, 101 Wn.2d 566, 683 P.2d 173 (1984).

In its final instruction regarding verdict forms, the trial court stated that the jury "must fill in the blank provided in each verdict form [with] the words 'not guilty' or the word 'guilty', according to the decision you reach." CP at 75 (No. 58911-7). The instruction later explained how to fill out verdict forms, stating several times that, "If you cannot agree on a verdict, do not fill in the blank provided in [the] verdict form." CP at 76 (No. 58911-7).

F.    Closing Arguments

      1.    Specification of acts or incidents

Both parties agree that during closing arguments, the State discussed multiple specific incidents of child assault that each child testified to and that occurred during the lengthy charging periods. The prosecutor did not elect single instances of Margie's alleged behavior for the jury to rely on when deciding whether to convict on each count. Instead, the State repeated much of the children's testimony, often listing several of Margie's alleged acts as the bases for convicting on a single count. We discuss the specific acts raised in closing argument in more detail below.

      2.    Tailoring

During closing arguments, the State said,

> I want you to pay close attention to the testimony of Simeon and Margie Cruz, because I'll submit to you, the testimony of Simeon and Margie Cruz in response to this mountain of evidence that has been presented, it might be very convenient. It's not compelling. And I'll be able to get into the reasons why it's not in rebuttal.

6 VRP at 2639.

During its rebuttal, the State further discussed Margie's testimony, specifically regarding items that the children testified about but police did not find in the Cruzes' house:

> Also in regards to the stuff that [wasn't] found, Margie Cruz testified that they were planning to move. They were cleaning their house. Of course, everything that's broken was going to go. She had testified, no, the Iron Man doll wasn't broken; we donated it to Goodwill. Once again, it's convenient. It's convenient after she heard the testimony, but it's not compelling.

6 VRP at 2702.

### III. VERDICT & SENTENCING

The jury found Margie guilty of the following crimes:

- Count I: second degree child assault of JC, originally charged as first degree child assault.

10

- Count II: second degree child assault of AC, originally charged as first degree child assault.
- Count III: fourth degree child assault of ZC, originally charged as first degree child assault.
- Count IV: second degree animal cruelty of Pepper.

The trial court dismissed Count V regarding second degree animal cruelty of Misty the cat because the jury could not reach a verdict on that count. The jury found Margie not guilty of Count VI, child molestation of ZC.

The trial court sentenced Margie to 61 months and 18 months of community custody. The trial court also imposed community custody conditions on Margie, including a condition that Margie must "[r]emain within geographic boundary, as set forth in writing by the Community Corrections Officer." CP at 188.

## ANALYSIS

### I. Jury Unanimity

A.     Specifying Acts or Instances

Margie argues that her convictions for Count I (second degree child assault of JC), Count II (second degree child assault of AC), and Count III (fourth degree child assault of ZC) should be reversed because the State failed to either propose a jury unanimity instruction or elect a single act for each count. The State concedes this was constitutional error. However, the State broadly argues that its failure to elect an instance or propose a unanimity instruction was harmless beyond a reasonable doubt on all three counts. Margie argues that this error was not harmless because a rational juror could have reasonable doubts regarding some of the alleged incidents that the State relied on in closing argument for the assault charges. Margie contends that a juror could have reasonable doubts because of the victims' inconsistent or conflicting testimony and Margie's denials.

11

1.    Legal principles

The federal and state constitutions guarantee criminal defendants the right to a unanimous jury verdict. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. When several acts are alleged and any one of them "could constitute the crime charged," but the defendant is charged with only one count of criminal conduct, there are two ways to protect jury unanimity. *State v. Beasley*, 126 Wn. App. 670, 682, 109 P.3d 849 (2005). Either the State must elect one incident to seek conviction on for each count, or the trial court has to instruct the jury that it must unanimously agree that "the same underlying criminal act" has been proved beyond a reasonable doubt for each count. *Id.*

Where there was no election or unanimity instruction, "some jurors may have relied on one act or incident and some another, resulting in a lack of unanimity on all of the elements necessary for a valid conviction." *State v. Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988), *abrogated on other grounds by In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 316 P.3d 1007 (2014).

We will reverse a conviction based on this error unless the State can demonstrate the error was harmless beyond a reasonable doubt. *Coleman*, 159 Wn.2d at 512. The failure to elect a specific incident or provide a unanimity instruction is only harmless "if no rational juror could have a reasonable doubt as to any of the incidents alleged." *Id.*

Generally, we find a unanimity error harmless where the jury convicted the defendant and there is "no material difference in the evidence supporting one act and the evidence supporting another." *State v. Aguilar*, 27 Wn. App. 2d 905, 928, 534 P.3d 360 (2023). Specifically, courts have affirmed convictions where there is not direct contravening evidence for any asserted instance and the defendant provided only a general denial, such that the jury either believed the victim or the defendant. *State v. Bobenhouse*, 166 Wn.2d 881, 894-95, 214 P.3d 907 (2009).

In *Bobenhouse*, the child victim testified that the defendant sexually assaulted the victim by forcing the victim to perform oral sex and inserting his finger into the victim's anus. *Id.* at 893. In closing, the State did not specifically elect either of these instances as the basis for one first degree child rape count, and the trial court did not provide a unanimity instruction. *Id.* at 894. The Washington Supreme Court held that this error was harmless because each incident was "independently capable of constituting" first degree child rape, the defendant offered only a general denial, and "the jury had no evidence on which it could rationally discriminate between the two incidents." *Id.* at 894-95. Because there was no evidence differentiating each instance—there was only consistent testimony from the victim and general denials from the defendant—if the jury believed one incident happened, "it must have believed each of the incidents happened." *Id.* at 895. In other words, without additional distinguishing evidence, the jury either believed the victim or the defendant, and the conviction itself demonstrated that the jury believed the victim.

Similarly, in *State v. Camarillo*, the Washington Supreme Court held that the failure to elect an instance or provide a unanimity instruction was harmless error where the child victim's testimony was detailed and consistent, there was no conflicting testimony, and the defendant provided only general denials. 115 Wn.2d 60, 70-72, 794 P.2d 850 (1990), *abrogated on other grounds by State v. Crossguns*, 199 Wn.2d 282, 505 P.3d 529 (2022). Though there was additional corroborative evidence for one of the instances, the court emphasized that it was the lack of "'direct, contravening evidence,'" like conflicting testimony, that made the error harmless. *Id.* at 70 (quoting *State v. Camarillo*, 54 Wn. App. 821, 828, 776 P.2d 176 (1989)).

In contrast, in *Kitchen*, a consolidated case, the Washington Supreme Court held that the failure to elect an instance or provide a unanimity instruction was reversible error because there

was "conflicting testimony" regarding some of the instances so "a rational juror could have entertained reasonable doubt as to whether one or more of them actually occurred." 110 Wn.2d at 412. For one of the defendants,

> [t]he victim described in detail the place and circumstances surrounding several incidents that could constitute the crime charged, but was not always certain as to exact dates. The defense introduced evidence of several past contradictory statements made by the victim, in which she stated that the allegations against her father were fabricated. The jury also heard testimony from witnesses testifying generally to Mr. Kitchen's and his daughter's character and reputation, and to circumstances and conversations surrounding and following the alleged acts.

*Id.* at 406-07. Thus, a rational juror could have had reasonable doubt as to at least one instance that could have been the basis for the verdict and, therefore, the error was not harmless. *Id.* at 412.

For another defendant in *Kitchen*, a witness refuted some of one victim's testimony and another victim had made conflicting statements about the extent of the molestation that was the basis for a charge. *Id.* at 407. And witnesses testified about one victim's potential motive to lie. *Id.* This evidence also raised reasonable doubt as to at least one alleged instance and therefore the unanimity error was not harmless. *Id.* at 412.

Similarly, in *Coleman*, the State conceded that testimony was inconsistent about one alleged instance of molestation during a movie. 159 Wn.2d at 513. The child victim's teacher and a social worker testified that the victim said the defendant touched her inappropriately during a specific movie. *Id.* at 514. However, the victim's school counselor testified that the victim said "'nothing really happened'" during the movie, and the victim herself denied that anything occurred during the movie at trial. *Id.* (quoting the record). The Washington Supreme Court held that under these facts involving conflicting testimony, the failure to elect an instance or provide a unanimity instruction was not harmless error. *Id.* at 514-15.

In *Aguilar*, Division One also reversed the defendant's rape conviction because the failure to elect an instance or provide a unanimity instruction was not harmless. 27 Wn. App. 2d at 930. The defendant admitted that he had sexual intercourse with the victim once on the couch and once in the bedroom. *Id.* at 929. "His defense instead focused on consent and attempted to puncture [the victim's] credibility by highlighting what he characterized as inconsistencies with her story and between her testimony and the physical evidence." *Id.* He argued that there was no physical evidence indicating the alleged break in, no fingerprints on one of the weapons he allegedly used, and no signs of trauma to the victim's sexual organs. *Id.* He also pointed out absences in the State's evidence, including the lack of testimony from the victim's neighbors about potential shouting from her apartment, the lack of the victim's ripped clothes as exhibits, and the State's failure to investigate the defendant's alleged use of the victim's phone on the evening in question. *Id.* Division One determined that a rational juror could have had a reasonable doubt as to one or both of the instances that served as the basis for the rape charge. *Id.* at 930. The court concluded that "the jury in this case had more evidence to weigh and consider than only the victim's testimony countered by the defendant's blanket denial. . . . The manner of Aguilar's entry into the apartment was contested, as were the events leading to sexual intercourse." *Id.* Additionally, some of the defendant's arguments about the weight of evidence and the victim's testimony went to one act where some went to the other, "and the jury could therefore differentiate between them." *Id.*

Thus, under the Washington Supreme Court's decisions in *Bobenhouse* and *Camarillo,* unanimity error may be harmless where the defendant offered a blanket denial, the quality and quantity of evidence supporting the various instances that could have formed the basis for the conviction are not materially different, and it is clear the jury believed the victim and disbelieved

the defendant with regard to whether all instances occurred. But both the Washington Supreme Court and this court have concluded that unanimity error is not harmless where at least one instance that forms the basis for the conviction is undermined by conflicting testimony or evidence in addition to the defendant's blanket denial.

2.      Count I: second degree child assault of JC

In closing arguments, the State discussed testimony about many instances when Margie physically abused JC. JC testified that Margie hit her "really hard" and it made one of her teeth loose. 5 VRP at 2250. KC stated that he saw Margie hit JC many times but never saw any injuries. ZC testified that Margie hit JC with her hands and with belts, and JC had black eyes, incisions, and "bruises everywhere" as a result. 5 VRP at 2127.

Several children testified, and the State argued in closing about an instance where Margie allegedly found JC looking at pornography on a computer. JC stated that she was forced to sleep in the garage as punishment. ZC testified that on this occasion, Margie grabbed JC's hair and hit her until JC begged Margie to stop. And KC recalled that Margie punched JC, pulled her pants down, and hit her "everywhere" until she was bleeding from her nose. 3 VRP at 1256. In contrast, Margie testified that after she found JC on the computer with pornography, she spanked JC and accidentally hit JC on the face when JC dropped to the floor, which caused JC to bleed.

JC also testified that Margie made her kneel on sharp objects, including a "meat pounder," frozen peas, and potentially needles, though she did not mention all of these items in prior interviews. 5 VRP at 2242. ZC testified that Margie forced JC to kneel on a cheese grater and rice.

JC testified that Margie and Simeon forced her to sleep on the house floor and garage floor, sometimes without blankets but with clothes. In earlier interviews, JC said that Margie made her

sleep on the floor once and in the garage once, but during trial, JC testified that Margie forced her to sleep in the garage at least two times. ZC testified that Margie forced JC to sleep in the garage naked.

JC testified that Margie put her in a cold shower. Sometimes ice was added to the shower and she would have to stay in the shower for about five minutes.

Like in *Bobenhouse* and *Camarillo*, JC provided consistent descriptions of each instance of Margie's alleged abuse, and Margie only gave a general denial that the instances occurred. Even Margie's differing allegation of how JC received a bloody nose constitutes a general denial where there is no other evidence supporting Margie's testimony regarding the incident.

After hearing testimony from both JC and Margie, the jury obviously did not find Margie's general denial credible because it convicted her of second degree child assault of JC. And there is no "'direct, contravening evidence concerning the occurrence of the alleged incidents.'" *Camarillo*, 115 Wn.2d at 70 (quoting *Camarillo*, 54 Wn. App. at 828). KC initially testified that he did not see any injuries on JC as a result of Margie's physical abuse, but later said he saw Margie give JC a bloody nose. However, KC's inconsistent testimony only goes to the severity of the injury resulting from Margie's alleged assault in that instance, not whether the assault actually occurred. Additionally, while JC did not mention every object Margie forced her to kneel on in prior interviews, this nondisclosure is consistent with Villa's explanation that her interview was not comprehensive—she never asked the children to recount all instances of abuse—so it was not surprising that there were instances the children did not mention to her. In fact, no interviewer testified that they asked the children to disclose every instance of abuse they experienced. This same logic also applies to JC's testimony about how many times Margie made her sleep in the

garage; her earlier interview comment that she slept in the garage on one occasion did not *conflict* with her trial testimony that she slept in the garage on additional occasions.

Because of JC's consistent testimony and the lack of contravening evidence concerning whether any of the instances of Margie's abuse of JC occurred, we can conclude that if the jury believed one incident happened, "it must have believed each of the incidents happened." *Bobenhouse*, 166 Wn.2d at 895. Even where there is inconsistent testimony as to the severity of injury resulting from one of Margie's assaults of JC—KC initially testified that he never saw injuries on JC because of Margie's abuse and then testified that Margie gave her a bloody nose— that is immaterial where, as here, we have concluded the jury must have believed the victim with regard to *all* of the alleged instances.

At least one of the instances about which we can be certain the jury believed JC's testimony, where Margie hit JC so hard that one of her teeth became loose, is sufficient to constitute second degree child assault. And there is no contradictory testimony about this instance other than Margie's general denial. Second degree child assault requires "bodily harm that is greater than transient physical pain or minor temporary marks." CP at 42 (No. 58911-7); *see also* RCW 9A.36.130. In *State v. R.H.S.*, Division One held that broken teeth would "[w]ithout question" constitute substantial bodily harm. 94 Wn. App. 844, 847, 974 P.2d 1253 (1999). It follows that hitting a child hard enough to knock a tooth loose without question would amount to the lesser injury of "harm that is greater than transient physical pain or minor temporary marks." CP at 42 (No. 58911-7). Thus, we conclude that the State's error was harmless and affirm Margie's conviction for second degree child assault of JC.

3.    Count II: second degree child assault of AC

AC testified that Margie and Simeon beat him on a daily basis, and AC discussed many instances when Margie assaulted him. Our description of AC's allegations of assault is not comprehensive and we focus on instances that the State discussed during closing argument.

AC testified that Margie hit him on the legs with a wire brush, which left marks that lasted for about a day. AC also said that Margie hit him with brooms and a "thick plastic Iron Man doll[]," breaking the doll. 4 VRP at 1491. KC heard, but did not see, Margie hit AC with an Iron Man toy, and he did not see any resulting marks on AC.

AC stated that Margie "choked" him. 4 VRP at 1504. AC also testified that Margie beat him with a stick, which "busted [his] lip." 4 VRP at 1519. AC said that Margie would slap him, leaving a handprint on his face. AC also stated that Margie would twist his arm until it hurt. AC said that this arm twisting did not leave any permanent injuries, except that his wrist sprains very easily now. Margie testified that she never twisted any of the children's arms, but she grabbed AC's arms twice to prevent him from trying to hit her.

In an earlier interview, AC said Margie hit his head against the pantry door, causing a hole in the door. While testifying, AC said that Simeon was the one who caused an indentation in the pantry door by hitting AC's head on the door. When defense counsel questioned the discrepancy, AC said both Margie and Simeon hit his head against the door that same day.

AC testified that Margie and Simeon would force him to kneel on a cheese grater, though he stated that this did not leave any lasting marks. AC also said that Margie and Simeon would force him to kneel on rice, which caused him "[s]evere pain." 4 VRP at 1495. AC testified that kneeling on rice did not cause him to bleed. But in a prior interview, AC said that kneeling on rice

made him bleed. ZC testified that Margie made AC kneel on rice and he had "slices all over his knees" and his "skin was sort of, like, peeling upwards and there was rice in it" as a result. 5 VRP at 2131.

AC testified that Margie and Simeon would starve him, forcing him to miss meals. AC also stated that he was forced to sleep in the bathtub, on the house floor naked, in a tent outside, and on the cement floor in the garage without any bedding. AC did not say he slept outside in a tent during one of his forensic interviews.

In its briefing, the State concedes that for this count, "it is clear from the totality of the evidence that the jury probably agreed that more than one of these assaults was the crime of assault in the second degree, but it is not certain that every juror believed that all the assaults were second degree assaults." Br. of Resp't at 9. While we agree with the State that more than one of these alleged instances likely constituted second degree child assault, there is conflicting testimony such that a reasonable juror may doubt that some of the instances occurred. For example, AC's earlier interview statement that Margie damaged the pantry door by hitting his head against it conflicted with his later testimony that Simeon's assault damaged the pantry door and Margie simply also hit AC's head against the door the same day. This inconsistency could cause doubt as to whether Margie assaulted AC by hitting his head on the pantry door at all. Accordingly, we cannot apply the *Bobenhouse* analysis and assume that the jury believed every alleged instance occurred. Thus, the State's failure to elect a specific instance or propose a jury instruction was not harmless error, and we reverse Margie's conviction for second degree child assault of AC.

4.      Count III: fourth degree child assault of ZC

Once again, our description of ZC's assault allegations is not comprehensive and is focused on instances mentioned in closing arguments. ZC testified that Margie slapped her and hit her with belts, broomsticks and "anything that was in the line of sight." 5 VRP at 2109. ZC stated that she had multiple scars and severe bruising as a result. But in an earlier interview, ZC stated that Margie and Simeon only beat her with their hands.

ZC stated that both Margie and Simeon, though mostly Margie, forced her to kneel on rice. ZC testified that she was forced to kneel on rice for "hours on end," which would result in indents on her knees that would last for several days. 5 VRP at 2123.

For this count, the State argues that its failure to elect an instance or propose a unanimity instruction was harmless because "the incidents alleged were similar allegations of assault, [Margie] responded with only a general denial, and there is no material difference in the evidence supporting one act and the evidence supporting other acts." Br. of Resp't at 14 (citing *Bobenhouse*, 166 Wn.2d at 894).

Here, unlike the failure to mention an instance in a prior interview that occurred with some of the children's testimony in Simeon's case, there is direct inconsistent testimony from ZC herself about some of the alleged assaults. In a prior interview, ZC said that Margie only ever hit ZC with her hands, but she testified during trial that Margie would hit her with objects like belts and brooms. Thus, this case is distinguishable from *Bobenhouse* where there was no inconsistent testimony as to any of the counts. 166 Wn.2d at 894-95.

Because of the inconsistencies in ZC's testimony, a rational juror could have had a reasonable doubt about whether some of the alleged instances of assault with objects like belts and

brooms occurred. Accordingly, we conclude that the prosecutor's failure to elect an instance or propose a unanimity instruction was not harmless. We reverse this conviction. Again, this reversal is based on a legal error that could have easily been avoided had the State elected a specific instance or proposed a unanimity instruction.[9]

B.      Double Jeopardy

The State charged and tried Margie for first degree child assault on Count II (child assault of AC) and Count III (child assault of ZC). However, the jury only convicted on second degree child assault for Count II and fourth degree child assault for Count III. Margie thus argues that double jeopardy prevents retrial on first degree child assault for Count II and first, second, and third degree child assault for Count III.[10]

Under the Fifth Amendment to the United States Constitution, a defendant cannot be tried again for a particular crime if they have already been acquitted of that crime. *State v. Glasmann*, 183 Wn.2d 117, 121, 349 P.3d 829 (2015). "However, silence does not terminate jeopardy when the record indicates that the jury failed to agree on a verdict." *Id.* at 121-22. In other words, "if the State charges a person with greater and lesser offenses and the jury is unable to agree regarding the greater offense, the State may retry the defendant for the greater offense without violating double jeopardy." *Id.* at 127. If the trial court instructs the jurors that they should leave the verdict form for the greater offense blank if they cannot agree on a verdict and instead consider the lesser

---

[9] We take this opportunity to note that where we reverse a conviction based on a unanimity error, we do not address whether the alleged instances of abuse actually occurred or whether the children's testimony is credible; those questions are for the factfinder.

[10] Because we affirm Margie's conviction for Count I (second degree child assault of JC), we need not address whether Margie can be retried for first degree child assault on this count.

offense, a blank verdict form for the greater offense does not trigger double jeopardy. *Id.* at 122-24.

Here, for all the child assault charges, the trial court instructed the jury, both verbally and on the written jury forms, that for the greater offenses, "If you unanimously agree on a verdict, you must fill in the blank provided in [the] verdict form . . . the words 'not guilty' or the word 'guilty,' according to the decision you reach. If you cannot agree on a verdict, do not fill in the blank provided in [the] verdict form." CP at 76 (No. 58911-7). The jury left the verdict form blank for first degree child assault on Count II, and it is undisputed that the jury left the verdict forms blank for first, second, and third degree child assault for Count III.[11]

Because the trial court explicitly instructed the jury to leave the greater offense verdict forms blank only if they could not agree on a verdict, double jeopardy does not prevent the State from retrying Margie on any greater offenses for child assault of AC and ZC.

## II. IMPROPER OPINION TESTIMONY

Margie argues that her conviction for Count I (second degree child assault of JC) should be reversed because Wahl's testimony provided an improper opinion that JC had been tortured, which is an essential element of second degree child assault. Margie argues that this was not harmless error because, though Margie was charged with first degree child assault of all three children, the jury convicted Margie of second degree child assault of JC and AC[12]—both of whom

---

[11] The verdict for first degree child assault on Count III is not included in the Clerk's Papers submitted to this court, but the parties do not dispute that the jury left that verdict form blank.

[12] Margie also argues that her conviction for second degree child assault of AC should be reversed because of Wahl's testimony that AC had been tortured. However, we reverse this conviction for lack of jury unanimity. Thus, any alleged error would not impact Margie's convictions, so we need not address this issue.

Wahl said were tortured—but convicted her of fourth degree child assault of ZC—who Wahl only said had been physically abused. *See* 5 VRP at 1912, 1918, 1923. The State contends that defense counsel did not object to Wahl's use of the word "torture" below, only objecting to her diagnosis of sexual abuse.

Opinion testimony about the guilt of the defendant invades the exclusive province of the jury. *State v. Kirkman*, 159 Wn.2d 918, 927, 155 P.3d 125 (2007). This testimony may constitute reversible error because it violates the defendant's right to a trial by jury. *Id.* When a defendant challenges improper opinion testimony for the first time on appeal, they must show that it was a manifest error affecting a constitutional right. RAP 2.5(a)(3).

In *State v. Montgomery*, the Washington Supreme Court concluded that witnesses improperly testified regarding their opinions on the defendant's guilt, specifically the defendant's "intent" to manufacture and distribute methamphetamine. 163 Wn.2d 577, 594, 183 P.3d 267 (2008). There was no objection to this testimony at trial. The Court held that this testimony did not prejudice the defendant and therefore did not constitute manifest error, because the jury was properly instructed that jurors are the sole judges of the credibility of witnesses and are not bound by witness testimony. *Id.* at 595-96. "Important to the determination of whether opinion testimony prejudices the defendant is whether the jury was properly instructed." *Id.* at 595.

We agree with the State that Margie did not object to Wahl's testimony about torture. Defense counsel's objection went to Wahl's diagnosis of sexual abuse for all of the children, not the use of the word "torture."

Because defense counsel did not object to this specific testimony below, we must also determine whether admission of this testimony was a manifest constitutional error. RAP 2.5(a)(3).

This issue is of constitutional magnitude because it affects Margie's right to trial by a jury. A constitutional error is manifest if the appellant can show actual and identifiable prejudice. *Kirkman*, 159 Wn.2d at 926-97.

We acknowledge Margie's argument that she was prejudiced by this testimony because she was convicted of second degree child assault, which includes an element requiring physical pain or agony equivalent to that produced by torture of JC and AC, both of whom Wahl testified were tortured. But Margie was convicted of fourth degree child assault of ZC, which does not mention torture, and Wahl did not say that ZC was tortured, only physically abused. 5 VRP at 1918.

However, like in *Montgomery*, the trial court instructed the jurors that they were not required to accept witnesses' opinions and should weigh credibility themselves. 163 Wn.2d at 595-96. And we presume that the jury followed that instruction. *Kirkman*, 159 Wn.2d at 928. The children's testimony was extensive, allowing the jurors to evaluate for themselves whether they experienced agony associated with torture. Moreover, the diagnosis that JC had been subject to torture was not a direct statement that Margie was guilty of second degree child assault or even that one of the elements of second degree child assault was met. Wahl did not say that Margie was the person who tortured JC. Thus, Wahl's diagnosis was not a direct statement of guilt or even a statement that an element was satisfied. Without further evidence that Wahl's testimony, specifically, influenced the jury's decisions, we follow existing case law establishing that the jury instructions were sufficient to combat any prejudice.

Thus, Wahl's testimony did not constitute manifest constitutional error and we need not reverse on this issue.

### III. Ineffective Assistance of Counsel

Margie argues that her defense counsel was ineffective for failing to object to the State's statements in its closing argument that Margie's testimony was "convenient" after she heard the children's testimony. 6 VRP at 2639, 2702. Margie argues that the State's comments were impermissible "generic tailoring" claims that Margie had tailored her testimony to combat the evidence against her. Br. of Appellant at 32.

A "tailoring" argument is an allegation that the defendant "conformed their testimony to the evidence they observed while attending trial." *State v. Carte*, 27 Wn. App. 2d 861, 871, 534 P.3d 378 (2023). A "specific" tailoring argument is derived from the defendant's actual testimony, whereas a "generic" tailoring argument is "based solely on the defendant's presence at the proceeding and not based on the defendant's direct examination or cross-examination." *Id.* In Washington, a generic tailoring argument raised only in closing argument may violate a defendant's right to be present at trial and confront witnesses. *State v. Martin*, 171 Wn.2d 521, 535, 252 P.3d 872 (2011); *Carte*, Wn. App. 2d at 873.

Here, the State said in its first closing argument that Simeon's and Margie's testimony "in response to this mountain of evidence that has been presented . . . might be very convenient." 6 VRP at 2639. During rebuttal closing argument, the State explained that Margie's testimony about giving away the Iron Man toy used to assault AC was "convenient," adding, "It's convenient after she heard the testimony, but it's not compelling." 6 VRP at 2702.

We reverse Margie's conviction for second degree child assault of AC, which is the conviction relevant to Margie's testimony about the Iron Man doll, for lack of jury unanimity, so we need not address the State's comments regarding the Iron Man doll. Additionally, we need not

decide whether the remaining challenged comment was an improper allegation of tailoring because it was not prejudicial. *See State v. Estes*, 188 Wn.2d 450, 457-58, 395 P.3d 1045 (2017) (stating that for an ineffective assistance of counsel claim, the defendant must demonstrate deficient performance *and* prejudice). The State's single comment that Margie's testimony "might be very convenient" is insignificant when compared with the evidence that the State cited in its entire closing arguments, including extensive testimony from the children, police, medical examiners, and forensic interviewers. 6 VRP at 2639. Margie suggests that the argument was prejudicial because it expressed doubts as to her veracity, which could have impacted the jury's general view of her. But given her general denial, any argument that she was guilty would have been perceived as an allegation that her denial was a lie. Thus, because Margie has not demonstrated prejudice, reversal of Margie's remaining convictions is not required based on her counsel's failure to object to the single reference to the convenience of her testimony.

## IV. OTHER ISSUES

Margie argues that the jury instructions for second degree animal cruelty omitted an essential element of the charge: that Margie owned Pepper, the animal in question. Margie argues that this was not harmless error because her ownership of Pepper was not supported by uncontroverted evidence. Margie contends that based on the testimony at trial, a reasonable juror may have concluded that ZC owned Pepper. The State concedes that this was error but argues that it was harmless.

We review to-convict jury instructions de novo. *State v. Jallow*, 16 Wn. App. 2d 625, 634, 482 P.3d 959 (2021). "A to-convict instruction must contain all of the essential elements of the crime because it serves as [a] 'yardstick' for the jury to measure innocence or guilt." *Id.* (quoting

*State v. Smith*, 131 Wn.2d 258, 263, 930 P.2d 917 (1997)). Omission of an essential element from a jury instruction "is of sufficient constitutional magnitude to warrant review when raised for the first time on appeal." *State v. Mills*, 154 Wn.2d 1, 6, 109 P.3d 415 (2005). Such an error is harmless only if "'the reviewing court is convinced beyond a reasonable doubt any reasonable jury would reach the same result absent the error.'" *State v. Richardson*, 12 Wn. App. 2d 657, 667, 459 P.3d 330 (2020) (internal quotation marks omitted) (quoting *State v. Chino*, 117 Wn. App. 531, 538, 72 P.3d 256 (2003)).

In this case, the trial court instructed the jury that an individual is guilty of second degree animal cruelty if they either knowingly, recklessly, or with criminal negligence inflict "unnecessary suffering or pain upon an animal" *or* if they fail "to provide necessary shelter, rest, sanitation, space, or medical attention for the animal and as a result the animal suffered substantial and unjustifiable physical pain." CP at 64 (No. 58911-7). Former RCW 16.52.207(2) (2020),[13] the second degree animal cruelty statute, states that for this second alternative means, the individual must be the owner of the animal. Both parties agree that this ownership requirement was not included in the animal cruelty jury instructions—which the State proposed—and that this omission was an error.

---

[13] RCW 16.52.207(2) was recently amended in 2025 to include language expanding ownership to also include those "in possession or control of, residing with, or who has accepted responsibility for, an animal." LAWS OF 2025, ch. 220 § 6. However, generally "a defendant's sentence is determined based on the law in effect at the time the defendant committed the crime for which [they are] being sentenced." *State v. Jenks*, 12 Wn. App. 2d 588, 592, 459 P.3d 389 (2020). Because the language requiring simply "ownership" was in effect during the charging period for Simeon's second degree animal cruelty count against Pepper, we do not apply the 2025 amended language.

However, we agree with the State that this error was harmless because no reasonable juror could have doubted Margie's ownership of Pepper from the evidence at trial. At trial, when asked if she had pets, Margie replied, "Yes. . . . Our last pets were Pepper and Misty." 6 VRP at 2351-52. MR also testified that the Cruzes had an old white dog when she lived with them. Margie further testified, "Pepper was adopted. He came to us - well, we purchased him through Petco." 6 VRP at 2352. Margie also stated that she and Simeon would feed Pepper.

Margie argues that there is a dispute about whether Pepper was actually ZC's dog. But ZC was the Cruzes' child at the time, and there is no dispute that Simeon and Margie were the adults in the family ultimately responsible for the dog. Margie even explained that Pepper "was everybody's dog, but we purchased it for [ZC], so we used to say that it was [ZC's] dog." 6 VRP at 2432.

Based on the uncontroverted evidence that Margie and Simeon, a married couple, purchased Pepper as a pet for the family and assumed care of him, no reasonable juror could have doubted that Margie was one of Pepper's owners. Thus, the error omitting the ownership element from the second degree animal cruelty instruction was harmless beyond a reasonable doubt and does not require reversal.

## V. COMMUNITY CUSTODY CONDITIONS

Margie argues that the community custody condition stating that she must abide by geographical boundary set by the Department of Corrections in writing was unconstitutionally vague.

A community custody condition is unconstitutionally vague "if it either fails to give fair warning of what is forbidden or fails to give ascertainable standards that will prevent arbitrary

enforcement." *State v. Johnson*, 197 Wn.2d 740, 747, 487 P.3d 893 (2021). "Sentencing courts have the power to delegate some aspects of community placement" to the Department of Corrections. *State v. Sansone*, 127 Wn. App. 630, 642, 111 P.3d 1251 (2005). However, trial courts "'may not wholesaledly abdicate . . . judicial responsibility'" for setting community custody conditions. *Id.* (internal quotation marks omitted) (quoting *United States v. Loy*, 237 F.3d 251, 266 (3rd Cir. 2001)). In other words, a trial court cannot give a probation officer "'an unfettered power of interpretation'" over a community custody condition. *Id.* (quoting *Loy*, 237 F.3d at 266).

Here, the trial court did not impose a specific geographic boundary. Instead, it clearly and unambiguously required Margie to comply with a boundary to be set by the Department. Under RCW 9.94A.703(1)(b), the sentencing court must require the defendant "to comply with any conditions imposed by [the Department] under RCW 9.94A.704." And the legislature *requires* the Department to set geographic restrictions for individuals it supervises based on an assessment of the individual's risk to community safety. RCW 9.94A.704(2)(a), (3)(b). Thus, given that the legislature granted the Department the authority to impose these geographic boundaries and provided guidelines for deciding how to impose them, the trial court did not improperly give the Department an unfettered power of interpretation. *See State v. Lundstrom*, ___ Wn. App. 2d ___, 572 P.3d 1243, 1245-46 (2025). Additionally, this community custody condition contemplates that the defendant will have sufficient notice of what the geographic boundaries are and this clarity also protects against arbitrary enforcement. Accordingly, the condition is not unconstitutionally vague.

CONCLUSION

We reverse Count II (second degree child assault of AC) and Count III (fourth degree child assault of ZC) and remand these counts for a new trial. We affirm Count I (second degree child assault of JC) and Count IV (second degree animal cruelty) and remand them for resentencing in accordance with this opinion.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
GLASGOW, J.

We concur:

_____
PRICE, J.

_____
CHE, J.